Charles R. Dubuc, Utah Bar No. 12079
Western Resource Advocates
150 S 600 E #2A, Salt Lake City, UT 84102
(801) 487-9911
rob.dubuc@westernresources.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

_____

|  |  |  |
|---|---|---|
| HEAL UTAH | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SIERRA CLUB | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. |
| | ) | |
| PACIFICORP | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____)

## COMPLAINT

## NATURE OF THE CASE

1.      This is a citizen suit brought to enforce significant and ongoing violations of the

Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), and the

Federal Water Pollution Control Act, otherwise known as the Clean Water Act ("CWA"), 33

U.S.C. § 1365 at Defendant PacifiCorp's Huntington coal fired power plant.

2.      PacifiCorp's Huntington Power Plant generates large quantities of liquid and solid

wastes, including coal ash, flue gas desulfurization ("FGD") waste or sludge, process waters,

contaminated storm water.  PacifiCorp's waste handling, transport, and disposal practices have caused extensive contamination of local ground and/or surface waters which may present an imminent and substantial endangerment to health and the environment in violation of RCRA. PacifiCorp's pollution discharge practices at the Huntington plant also violate the CWA by discharging pollution, dredge, and/or fill material without a permit and/or in violation of existing permits.

3.     For thirty years, PacifiCorp has disposed of the highly toxic coal ash and FGD wastes in two landfills on the power plant site and continues to use one of the landfills for that purpose.  In addition, PacifiCorp has transported these waste from the power plant to the landfills and continues to do so.

4.     Contaminated leachate from the landfills runs into freshwater streams on the power plant site.  Most of the leachate is then intercepted and conveyed to a holding pond where it mixes with other liquid power plant wastes.  PacifiCorp then sprays the mixed liquid wastes onto a "research farm" on the power plant property.  These wastes then drain and/or infiltrate to Huntington Creek.

5.     Pollution of surface waters caused by the leachate from the landfills exceeds levels at which scientific studies have found harm to aquatic life, plants, and other organisms.  In addition, the wastes flowing to Huntington Creek exacerbate an impairment of water quality for excess dissolved salts that has already been declared by the state of Utah.  Therefore, this pollution may present an imminent and substantial endangerment to the environment in violation of RCRA.

6.     This action seeks declaratory and injunctive relief under RCRA and the CWA, as well as the imposition of civil penalties for ongoing violations of the CWA.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C. § 1365(a); 42 U.S.C. § 6972(a)(1)(B); 28 U.S.C. §§ 1331 & 1367(a).  The relief requested is authorized pursuant to 33 U.S.C. § 1365, 28 U.S.C. §§ 2201 & 2202, and 42 U.S.C. § 6972.

8.      Pursuant to 28 U.S.C. §1391(b) and (c), 33 U.S.C. §1365(c), and 42 U.S.C. § 6972(a), venue lies in this District because the Huntington power plant, sources of PacifiCorp's discharges, and the endangerment resulting from PacifiCorp's waste management practices, are all located in this District.

9.      Pursuant to RCRA, 42 U.S.C. § 6972(b)(2)(A) and the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiffs gave more than sixty days notice of their CWA claims and more than ninety days notice of their RCRA claims to all required parties prior to the commencement of this lawsuit, including (a) PacifiCorp, (b) the United States Environmental Protection Agency (EPA), (c) the U.S. Attorney General, and (d) the Utah Department of Environmental Quality (DEQ).  A copy of Plaintiffs' notice letter is attached hereto as Exhibit A and is incorporated herein by reference.

10.      At least 90 days have passed since service and receipt of Plaintiffs' October 15, 2015 notice letter and neither EPA nor Utah has commenced or is diligently prosecuting a civil or criminal action against PacifiCorp in a court of the United States or a state to require compliance with the laws, rules, regulations, permits, standards, limitations and orders at issue in this case prior to the commencement of this action. Moreover, neither the federal government nor Utah has commenced an administrative action, or any other action, against PacifiCorp for the violations alleged herein prior to the date of Plaintiffs' October 15, 2015 notice letter.  Plaintiffs are commencing this action within 120 days of the date of service of its notice letter.

11.     Defendant PacifiCorp has violated, and remains in violation of, RCRA, the CWA, the implementing regulations and/or its discharge permits.

12.     Plaintiffs have standing to pursue this action because HEAL Utah and Sierra Club have many members in Utah, some of whom recreate, visit, travel and/or own property in the vicinity of the Huntington plant. These members would like to engage in other recreational, domestic, and/or agricultural activities on and along Huntington Creek and its tributaries near and downstream of the plant, but limit their activities or refrain from undertaking activities because of pollution from the Huntington plant.  The pollution from the Huntington plant also detracts from their enjoyment of the area.  Members of these organizations are adversely affected by PacifiCorp's illegal ground and surface water discharges and failure to obtain permits and/or comply with permit conditions.

13.     Members of these organizations used to have more extensive contact with waters in or from Huntington Creek but now limit their activities because they are concerned that the water and aquatic life are contaminated with pollution from the Huntington plant.  In addition, at least one member of these organizations used to utilize groundwater and/or surface water near the Huntington plant for agricultural and other purposes, but no longer does so because the streams are too polluted.  Members of these organizations believe that local wildlife and aquatic life has been affected by the stream pollution.  Members of these organizations also find the visible evidence of pollution and the pollution sources on the plant property aesthetically displeasing, reducing their use and enjoyment of nearby properties and the local environs.

14.     Finally, at least one member owns and/or utilizes property close to the Huntington plant and believes the water pollution from the plant has damaged their property and crops, and has reduced the value of the member's property.

15.     Defendant's illegal discharges of pollution into the groundwater and local surface waters have caused high levels of pollution that impair the health of the aquatic ecosystem and use of the water. Defendant's illegal discharges have degraded and continue to degrade the quality of these waters, and thereby adversely affect the recreational, aesthetic, environmental, property, and other interests of the organizations' members. The interests of the members of these organizations have been and will continue to be affected by the Defendant's failure to comply with federal environmental law.  The injuries complained of by Plaintiffs and their members are fairly traceable to the illegal actions of PacifiCorp.

16.     The interests Plaintiffs seek to protect are germane to the organizations' purposes.

17.     Neither the claims asserted in this Complaint, nor the relief requested, require the participation of the individual members of the organizations in this lawsuit.

18.     The Court can remedy the injuries suffered by Plaintiffs and their members by enforcing RCRA and the CWA, imposing civil penalties under the CWA, and by granting the relief requested in this Complaint.  Accordingly, Plaintiffs have standing to bring this action and this Court has subject matter jurisdiction over this action.

## PARTIES

19.     Plaintiff HEAL Utah is a Utah non-profit corporation.  HEAL Utah's mission is to engage its members and residents of Utah in the effort to promote renewable energy and protect public health and the environment from dirty, toxic, and nuclear energy threats, as well as the pollution of the air, land, and water.  HEAL Utah is a membership organization.  HEAL Utah maintains its principal place of business at 824 South 400 West, Suite B111, Salt Lake City, Utah 84101.

20.     Sierra Club is America's oldest and largest grassroots environmental organization with more than 600,000 members and supporters nationwide including almost 4,000 members who reside in Utah and belong to its Utah Chapter. The Sierra Club is dedicated to exploring, enjoying, and protecting wild places of the Earth; to practicing and promoting the responsible use of Earth's resources and ecosystems; to educating and enlisting people to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass the exploration, enjoyment and protection of land and water in Utah.

21.     HEAL Utah and Sierra Club are "citizens" within the meaning of section 505(g) of the CWA, 33 U.S.C. §1365(g), and section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

22.     Defendant PacifiCorp is an Oregon corporation and is wholly owned by Berkshire Hathaway Energy.  PacifiCorp does business in Utah under the name Rocky Mountain Power, which is a unit of PacifiCorp.

23.     Defendant PacifiCorp owns and operates the Huntington power plant, Deer Creek Mine, and the related coal ash landfills, impoundments, ponds, coal piles, research farms, irrigation pond, settling ponds and all appurtenances to the power plant and mine.

24.     In its own name, Defendant PacifiCorp applies for, and acquires, pollution discharge permits under the CWA from the Utah Department of Environmental Quality and/or the U.S. Environmental Protection Agency.

25.     Defendant PacifiCorp is a "person" within the meaning of section 502(5) of the CWA, 33 U.S.C. § 1362(5), and section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

## LEGAL AND FACTUAL BACKGROUND

26.     Defendant PacifiCorp owns and operates the Huntington Power Plant, a two-unit coal burning power plant constructed in the 1970s and located near Huntington, Utah.

27.     The Huntington plant consists of two coal fired boilers, the adjacent Deer Creek coal mine that supplies coal to the plant, coal storage piles, two coal ash landfills, numerous onsite pollution settling/storage ponds and/or impoundments, a waste disposal pond (referred to as the "irrigation pond"), several waste disposal land application sites (referred to as "research farms"), and various equipment and piping that is appurtenant to the power plant.

28.     The power plant produces liquid and solid wastes, including, but not limited to, coal ash, flue gas desulfurization liquids and solids, plant process water, storm water, collected ground water, and ash landfill leachate.

29.     Coal ash is produced from the burning of coal in the power plant boilers.  Once coal is combusted, it leaves various ash waste products, including fly ash, bottom ash, and boiler slag.  These coal combustion byproducts have been disposed of at various locations on the plant property since commencement of operations, including disposal in the coal ash landfills.

30.     Coal ash waste is generally alkaline and contains high levels of environmentally toxic heavy metals such as arsenic, boron, lead, selenium, and hexavalent chromium.  Water that contacts the coal piles, coal refuse, and coal ash waste creates liquids and leachate that enters ground or surface waters threatening the health of local residents, makes groundwater unsafe to drink and use for agriculture, harms aquatic and other wildlife, and pollutes rivers and streams. Liquids and leachates from these types of waste also cause high levels of dissolved salts in water, which is harmful to aquatic and other wildlife, plant life, and freshwater streams.

31.     Flue gas desulfurization waste results from the capture of combustion byproducts, such as sulfur dioxide, by a wet scrubber.  Flue gas desulfurization waste contains a significant concentration of polluted liquid material.  This liquid waste has been disposed of in the onsite coal ash landfills, as well as other land disposal areas on the Huntington power plant property, including in the waste disposal pond (known as the "irrigation pond"), in onsite settling/storage ponds (including a man-made impoundment referred to as the "Duck Pond") and in onsite land application units (referred to as "research farms").

32.     Since at least 1973, PacifiCorp has disposed of coal ash, flue gas desulfurization waste, and/or flue gas desulfurization sludge in onsite ash landfills. The coal ash landfills were constructed in areas close to and in streams located on the Huntington plant property.  Disposal of flue gas desulfurization waste and other liquid wastes in the coal ash landfills resulted in leachate seeping from landfills along the ground surface into the bed of the natural stream courses.  In addition, a natural spring that fed into these streams became contaminated.  Details of available measurements of the contamination are provided in Plaintiffs' October 15, 2015 notice letter which is attached hereto as Exhibit A and is incorporated herein by reference.

33.     The levels of contamination in the spring and the streams were and are toxic to living organisms such as aquatic life and plants that would have utilized the watercourses as habitat.

34.     These natural streams used to flow into Huntington Creek.  However, the leachate from the ash landfills caused significant contamination of these streams.   Over 10 years ago, PacifiCorp constructed an impoundment, referred to as the "Duck Pond," by placing and/or discharging dredge or fill material, such as dirt and rock, in the natural stream courses, thus

preventing these tributaries from reaching Huntington Creek via the natural stream course.  This diversion killed any aquatic organisms living in the old stream course.

35.     In or around the year 2009, PacifiCorp placed and/or discharged dredge or fill material, such as concrete, dirt and rock, in the natural stream courses upstream of the Duck Pond to collect leachate closer to the landfills.  The collected leachate was then piped to the irrigation pond to be mixed with the other liquid wastes for future on-site disposal.  Details of these diversion measures are provided in Plaintiffs' October 15, 2015 notice letter which is attached hereto as Exhibit A and is incorporated herein by reference.

36.     The irrigation pond receives co-mingled liquid wastes that result from Huntington Power Plant operations, including but not limited to, flue gas desulfurization waste, storm water, treated sewage, process waters, coal ash leachate, and contaminated surface waters.  These liquid wastes are piped and pumped to the irrigation pond from various pollution sources on the power plant property.  During the spring, summer, and fall, these liquid wastes are land applied to the "research farms" and allowed to infiltrate into the soil.  These co-mingled liquid wastes have levels of metals and salts that harm crops and other organisms.  In addition, they have infiltrated into the local groundwater and/or surface water resulting in significant contamination to these resources.  PacifiCorp's mismanagement of these co-mingled liquid wastes have resulted in contamination of ground and/or surface waters exceeding water quality standards, protection levels, and/or drinking water standards.  Again, details of the available measurements of the contamination are provided in Plaintiffs' October 15, 2015 notice letter which is attached hereto as Exhibit A and is incorporated herein by reference.

37.     The contaminated groundwater flows from PacifiCorp's property into Huntington Creek, raising the already problematic levels of dissolved salts in that stream, and adding to its pollutant load of coal ash and FGD waste constituents.

38.     Based on information and belief, PacifiCorp is also discharging pollutants from various point sources into Huntington Creek and/or Fish Creek without the required permit(s) and/or in violation of its existing permit(s).  More specifically, on several occasions Plaintiffs' representatives have observed a discharge from a retaining wall embankment located on the Huntington Power Plant property.  The discharge appears to be conveyed to Huntington Creek via a pipe emerging from the retaining wall.  Based on information and belief, the source of the water discharging from the retaining wall is process water, storm water, contaminated ground water, and other pollutants, contaminants, and chemicals added to a settling pond that collects these co-mingled waste streams and is located upgradient of the discharge.  Based on information and belief, the discharge contains pollutants, including but not limited to barium, boron, sulfate, iron, total suspended solids, and total dissolved solids.  Based on information and belief, PacifiCorp does not have a CWA permit authorizing this discharge into Huntington Creek.  A photograph of the discharge location was included in Plaintiffs' October 15, 2015 notice letter served on PacifiCorp and various governmental agencies.  A copy of Plaintiffs' October 15, 2015 notice letter is attached hereto as Exhibit A and is incorporated herein by reference.

39.     Based on information and belief, PacifiCorp is also discharging contaminated storm water from a large coal storage pile into Fish Creek and/or Huntington Creek in violation of its Industrial Storm Water Permit.  Based on information and belief, the adjacent Deer Creek coal mine, owned by PacifiCorp, used to provide the coal burned at the Huntington Power Plant.

However, the Deer Creek mine closed in recent years, resulting in a large quantity of coal being trucked to the power plant from various coal mines in the region.  The trucked coal is dumped onto a large coal storage pile located across the highway from the power plant along Burma Road.  Plaintiffs' representatives have observed storm water or other non-storm water discharges flowing from the coal pile offsite and onto Burma Road.  This water and/or storm water comes in contact with the coal pile and/or coal that is spilled onto Burma Road.  Plaintiffs' representatives have observed evidence of storm water and/or water flows from the coal pile, across Burma Road, and down into a valley leading to Fish Creek.  Fish Creek is a tributary of Huntington Creek a short distance down gradient from the power plant and coal storage pile.  Based on information and belief, the storm water and/or water discharging off site from the coal pile contains pollutants, including but not limited to metals, total suspended solids, iron, total dissolved solids, and acidity (pH).   Based on information and belief, this discharge of contaminated storm water from the coal storage pile into or near Fish Creek and Huntington Creek constitutes a violation of PacifiCorp's Industrial Storm Water Permit.

## CAUSES OF ACTION

**Count 1: Violations of 33 U.S.C. § 1311(a) and/or § 1344(a) and (f)(2) of the CWA by the discharge of dredge and fill material into navigable waters without a permit.**

40.     The allegations set forth in Paragraphs 1 through 39, as well as Exhibit A, are incorporated herein by reference.

41.     Pursuant to 33 U.S.C. § 1362(5), PacifiCorp is a "person" subject to the citizen suit provisions of the CWA.

42.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of

a permit, such as a permit issued by the U.S. Army Corps of Engineers pursuant to Section 404 of the CWA, 33 U.S.C. § 1344, for the discharge of dredged or fill material into navigable waters of the United States.

43.     Section 505(a) of the CWA, 33 U.S.C. § 1365(a), authorizes any "citizen" to "commence a civil action on his own behalf. . . against any person ... who is alleged to be in violation of .... an effluent standard or limitation under this chapter."

44.     Section 505(f)(1) of the CWA, 33 U.S.C. § 1365(f), defines an "effluent standard or limitation under this chapter," for purposes of the citizen suit provision in Section 505(a) of the CWA, 33 U.S.C. § l365(a), to mean, among other things, an unlawful act under Section 301(a), 33 U.S.C. § 1311 (a), of the CWA.

45.     In an action brought under Section 505(a) of the CWA, 33 U.S.C. § 1365(a), the district court has jurisdiction to order the defendant or defendants to comply with the CWA and to assess civil penalties under Section 309(d) of the CWA, 33 U.S.C. § 1319(d).

46.     Under Section 505(d) of the CWA, 33 U.S.C. § 1365(d), the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

47.     Based on information and belief, prior to PacifiCorp's manipulation of the streams in West End Canyon and Landfill Canyon, those streams were tributary to Huntington Creek and were "navigable waters" under the CWA.

48.     In 1979, PacifiCorp built the Duck Pond in Landfill Canyon by creating an earthen berm by discharging dredged and/or fill material, such as rock and dirt, into Landfill Canyon to divert the flow in Landfill Canyon from its natural path to a man-made drainage ditch.

To date, the dredge and fill material remains in Landfill Canyon, as does the man-made Duck Pond.

49.     Based on information and belief, in approximately October 2009, PacifiCorp also intercepted natural flows in West End Canyon and Landfill Canyon and diverted these flows to the irrigation pond (also knows as the evaporation pond) by dredging and/or filling these tributaries with dirt, rocks, pipes, pumps, sumps, and/or ditches.  The water in these streams no longer flow to Huntington Creek.  Instead the water is conveyed to the irrigation pond where it either infiltrates into the ground or is land applied to the research farms along with other co-mingled liquid wastes. These dredged and fill materials remain in place and impair the flow of these navigable waters to Huntington Creek.

50.     Based on information and belief, PacifiCorp never obtained a permit to construct the Duck Pond, discharge dredged and fill material into Landfill Canyon or West End Canyon, and/or intercept flows in Landfill Canyon and West End Canyon.

51.     Sections 301(a) and 404(a) of the CWA require a permit for any discharge of dredged or fill material into navigable waters of the United States.  Section 404(f)(2) of the CWA prohibits "any discharge of dredged or fill material into navigable waters incidental to any activity having as its purpose bringing an area of navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced" without a permit under this section.

52.     PacifiCorp's dredging, filling, and/or interception of natural flows in Landfill Canyon and West End Canyon without a permit violates 33 U.S.C. § 1311(a) and/or 33 U.S.C. § 1344(f)(2).

53.     PacifiCorp is subject to civil penalties and injunctive relief for its violations.

**Count 2: PacifiCorp's disposal of solid waste has created an imminent and substantial endangerment to the environment in Landfill Canyon, West End Canyon, and the research farms in violation of RCRA.**

54.     The allegations set forth in Paragraphs 1 through 53, as well as Exhibit A, are incorporated herein by reference.

55.     Pursuant to 42 U.S.C. § 6903(15), PacifiCorp is a "person" subject to the citizen suit provisions of RCRA, 42 U.S.C. § 6972.

56.     Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), authorizes citizens to bring suit "against any person . . . who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

57.     Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), empowers the Court to compel any person referred to in paragraph (1)(B) "to take such . . . action as may be necessary" to eliminate the endangerment.

58.     Section 7002(e) of RCRA, 42 U.S.C. § 6972(e), authorizes the Court to award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate.

59.     The Huntington Plant is located approximately 110 miles south east of Salt Lake City in the high desert in Utah.  *See* Figure 1 to Plaintiffs' notice letter attached as Exhibit A. The plant consists of two units, both of which burn coal and produce coal ash and FGD waste. Each unit generates 480 MW of electricity and both were constructed in the early 1970s.  The plant is located in Huntington Canyon adjacent to State Route 31.  *See* Figure 2 to Plaintiffs' notice letter attached hereto as Exhibit A.

60.     Since at least 1973, PacifiCorp has disposed of the coal ash from these units in landfills at the site.  The first landfill used, now termed the "old ash landfill", lies to the south of the plant between two unnamed tributaries of Huntington Creek.  The most northerly tributary flows in the bottom of West End Canyon.  The "new ash landfill" came into operation on or around July 2000 and is located to the southeast of the old landfill on a bluff on the other side of the canyon containing the most southerly tributary which we term "Landfill Canyon."  Neither landfill is lined and the State of Utah did not initially require them to be permitted as solid waste disposal facilities.  Neither did the state initially require a groundwater discharge permit.

61.     In addition to disposing of coal combustion wastes in the landfills, PacifiCorp also disposed of such wastes to Lacey's Lake, which it built in 1979.  *See* Figure 3 to Plaintiffs' notice letter attached hereto as Exhibit A.  The wastes disposed there included FGD slurry.  The "lake" acted as a settlement basin to remove suspended ash and combustion wastes.  According to the State of Utah, "[d]isposal of combustion waste products in this unlined pond [Lacey's Lake] has led to exceedances of permit protection levels in downgradient well HSW-1." Earlier in December 2010, PacifiCorp stated its intention to close this pond.  To do so, it stated it had to eliminate flow from the ash loading and dewatering areas.  It was then going to dredge the pond and fill it in. The dredged material was to be disposed to the on site landfill.  Lacey's Lake closed in late 2011.

62.     In 1979, PacifiCorp also constructed the "Duck Pond" to intercept the drainage from Landfill Canyon and a local spring that discharged into West End Canyon.  The Duck Pond is at the mouth of Landfill Canyon but upgradient of the research farm.  Originally the purpose of the Duck Pond was to collect the water in Landfill Canyon and West End Canyon so that it could

be diverted directly into Huntington Creek via a point source.  *See* Figure 3 to Plaintiffs' notice letter attached hereto as Exhibit A.

63.     Below the Duck Pond, in a flat area to the northwest of the landfills, PacifiCorp operates a "research farm."  Various effluents from the plant are collected in an "evaporation pond" and are then used to irrigate the grass, alfalfa, or other crops grown at the "research farm." *See* Figure 2 to Plaintiffs' notice letter attached hereto as Exhibit A.  A drainage system under the farm collects shallow groundwater, which is routed to a point source field drain to Huntington Creek.  This flow discharging to Huntington Creek from the field drain was estimated to be 40 to 50 gpm.  Huntington Creek, adjacent to the research farm, is listed by the State of Utah under § 303(d) of the CWA, 33 U.S.C. § 1313(d), as impaired for temperature and Total Dissolved Solids ("TDS"), which means that it violates state water quality standards for those pollutants.

64.     PacifiCorp also operates a second water pollution disposal site, which is known as the Rock Garden.  The Rock Garden is located across Highway 31 from the plant and above the evaporation pond.  *See* Figure 2 to Plaintiffs' notice letter, attached hereto as Exhibit A.  Effluent in the evaporation pond is also sprayed onto the Rock Garden.  Finally, there is a canal near the research farm that drains the Stump Flat area into Huntington Creek.  On occasion this canal has overflowed to the research farm.

65.     A 2003 report prepared by PacifiCorp details the history of contamination caused by the coal ash disposal operations.  According to the report, groundwater flows into Huntington Creek below the farm.  Groundwater velocities are 5 to 20 feet/day.  Water in the spring (monitoring at H-11) discharging to West End Canyon and the Duck Pond degraded significantly with respect to chloride, TDS, boron, and sulfate starting in about 1996.  *See* Figure 3 and Figure

16

5 to Plaintiffs' notice letter attached hereto as Exhibit A.  All of these chemicals are found in coal ash, leading PacifiCorp to admit that this may have been caused by the ash landfills.  Figure 5 to Plaintiffs' notice letter shows that the spring contamination spiked in 1998 with respect to TDS, chloride, and boron, indicating that the leading edge of a plume from the landfills reached the spring at that time.  Boron is often used as an indicator of coal ash pollution because it is highly soluble and mobile in groundwater.  In terms of absolute levels, between 1998 and 2002, boron levels in the spring went from less than 1 mg/L to over 50 mg/L, TDS went from about 2,000 to 11,000 mg/L, chloride went from 500 to over 3,000 mg/L and nitrate went from around 2 mg/L to around 25 mg/L.

66.    Figures 2 and 3 of Plaintiffs' notice letter show that the groundwater levels of TDS, chloride, boron, and nitrate steadily increased between 1997 and 2003.  Well NH-5W, the well furthest from the landfills had the lowest increases, while NH-4W, the well closest to the new landfill had the highest.  *See* Figure 3 to Plaintiff's notice letter for well locations.  Figure 4 shows that the field drain showed large increases in nitrate in 2002, but with seasonal fluctuations.

67.    A 2007 report prepared by a consultant for PacifiCorp confirms that the observed contamination was caused by the waste disposal operations, particularly placement of large amounts of sulfur scrubber slurry into the landfills in addition to fly ash and bottom ash.  In 2003, seepage started to emerge from the toe of the new landfill.  PacifiCorp's consultant found that this seepage was from the sulfur scrubber slurry.  This report concluded that the stream in Landfill Canyon had experienced "significant impacts to groundwater or surface water quality…most likely due to the disposal of FGD [sulfur scrubber] slurry."

68.     The monitoring results from 2003 to 2014 show that the contamination has
continued to intensify and spread.  Appendix 1 to Plaintiffs' notice letter provides the latest
results.  Looking at boron only to simplify the discussion, the groundwater downgradient of the
landfills below the stream bed in Landfill Canyon is around 30 to 60 mg/L, compared to an
upgradient level of 0.5 to 0.7 mg/L.  The wells on the upgradient side of the farm, closest to the
coal ash landfills, have boron concentrations from 4 to 7 mg/L.  The wells on the downgradient
side of the farm have boron levels ranging from <0.5 to 6 mg/L.  This indicates that the source of
most of the boron is the ash landfills.  In addition, this pollution is continuing to spread and has
now reached the edge of the farm.  For example, the boron levels at H-8W, adjacent to
Huntington Creek, have increased steadily from 1.00 mg/L in 2009 to 2.00 mg/L in 2014.  Levels
at NH-6W have also increased but less steadily over the same period.  These results are
consistent with the ongoing spread of a plume of groundwater contamination from the landfills
below the farm area.

69.     Surface water samples in the north fork of Landfill Canyon near the old landfill
show boron levels of around 50 mg/L, chloride levels of 1,700 to 2,200 mg/L, sulfate levels of
3,000 to 4,500 mg/L, and TDS levels of around 9,000 mg/L.  In the south fork, near the new
landfill, boron levels are around 10 mg/L, chloride levels are around 3,000 mg/L, sulfate levels
are 4,000 to 5,000 mg/L, and TDS levels are 10,000 to 12,000 mg/L.  Just before the Duck Pond,
the creek in Landfill Canyon had boron levels of 19 mg/L, chloride levels of 2,900 mg/L, sulfate
levels of 6,000 mg/L, and TDS levels of 13,000 mg/L before it was dewatered in 2009.  The flow
to the Duck Pond from West End Canyon had boron levels of 5 mg/L, chloride levels of 640
mg/L, sulfate levels of 850 mg/L, and TDS levels of over 2,000 mg/L in 2014.  The Duck Pond
inflow to the pumphouse (formally the outfall to the Creek) has boron levels of around 2 mg/L,

chloride levels of 300 to 500 mg/L, sulfate levels of over 500 mg/L, and TDS levels of over

1,400 mg/L.  The flow to the field drain has boron levels of around 1.5 mg/L, chloride levels of

260 mg/L, sulfate levels of over 600 mg/L, and TDS levels of 1,500 mg/L.

70.     These levels show that pollution from the coal ash waste in the landfills has now

spread widely on the site and has reached the groundwater adjacent to Huntington Creek in

places.  The upstream/downstream sampling in Huntington Creek show that it normally gains in

conductivity and TDS as it passes the farm.

71.     EPA has not established a water quality criterion for boron, but the Department of

the Interior has established a no effects threshold of 0.5 mg/L for aquatic plants, 6 mg/L for

aquatic invertebrates, and 5 mg/L for fish. The water in Landfill Canyon violates all of these

criteria, showing that it is an endangerment to the environment.  The highest levels found are one

hundred times the most sensitive criterion.  In West End Canyon boron levels are approximately

5 mg/L, which is ten times the most sensitive criterion and therefore creates an endangerment.

72.      Utah has set a boron standard of 0.75 mg/L for water to be used for agricultural

irrigation.  Utah Admin. Code R317-2-14.  The flows in both Landfill and West End Canyon far

exceed this criterion.  The water draining the pump house from the field drains has double the

amount of boron allowed by the state for agricultural irrigation.  This shows that PacifiCorp is

endangering the health of the crops on the research farm by allowing the continuing spread of

pollution from coal combustion wastes.

73.     For chloride, EPA has set a Criterion Continuous Concentration ("CCC")

standard of 230 mg/kg. The CCC is an estimate of the highest concentration of a material in

surface water to which an aquatic community can be exposed indefinitely without resulting in an

unacceptable effect.  All the recent surface water quality monitoring samples on the site exceed

the CCC for chloride, as does the flow to the field drains.  Near the landfills the levels are over

ten times the CCC.  This shows that the levels of chloride in the surface water may present an

imminent and substantial endangerment to the environment in Landfill and West End Canyons.

74.     For total dissolved solids, the maximum concentration allowable in fresh water is

about 1,000 mg/L.  Above that the water becomes brackish and less suitable for freshwater life.

Utah has set a standard of 1,200 mg/L for water to be used for agricultural irrigation.  R317-2-14.

The water in Landfill Canyon violates that criterion by approximately ten fold.  West End

Canyon flows violate the same criterion by a factor of 2.  This shows that these levels of TDS

may present an imminent and substantial endangerment to the environment in Landfill and West

End Canyons.  Even flows from the field drains exceed these criteria, showing that high levels of

salinity may be endangering the crops on the research farm.

75.     Sulfates are one of the main contributors to high TDS in runoff from coal

combustion wastes, particularly FGD sludge.  In Appalachian streams, West Virginia has

determined that sulfate levels above 290 mg/L are a likely stressor to aquatic life. In places, Utah

water quality standards specify a standard of 2,000 mg/L to protect watering livestock.  In

Landfill Canyon sulfate levels are 3,000 to 5,000 mg/L, exceeding both of these criteria by a

large margin.  Thus, the sulfate levels in the stream in Landfill Canyon may present an imminent

and substantial endangerment to the environment.

76.     At other coal combustion waste disposal sites, pollution from these wastes have

caused endangerment by contributing to high levels of arsenic, chromium, cobalt, fluoride, iron,

manganese, molybdenum, thallium, and selenium that may present an imminent and substantial

endangerment to the environment.  The levels of boron measured in Landfill Canyon far exceed

those at other well-known sites which were severely polluted by coal combustion wastes.  For

example, at the Little Blue Run site in Pennsylvania, the maximum boron level in surface water was 8 mg/L and this was associated with a violation of applicable criteria for arsenic and other pollutants.  PacifiCorp water quality data fails to include these potential pollutants.  However, based on information and belief, the levels of the parameters specified in this paragraph may present an imminent and substantial endangerment to the environment in Landfill and West End Canyons, in the groundwater below the research farm, and in Huntington Creek.

77.     Finally, the pollution from the coal combustion wastes has endangered the environment in Landfill Canyon by causing PacifiCorp to intercept all the flow in that Canyon before it reaches the Duck Pond.  The lower reaches of the canyon have been dry since 2009, when PacifiCorp completed its interception measures to combat the pollution.  In addition, PacifiCorp diverted the outflow of the drain from the Duck Pond underground to the pump house.  These two actions endangered the environment by drying out and dewatering formerly aquatic environments.

78.     PacifiCorp has contributed to and is contributing to the treatment, handling, transportation, and disposal of the coal ash, FGD, and liquid wastes at the power plant site.

79.     Pollution from those wastes is reaching the local streams via groundwater flow and springs in levels that are environmentally harmful to the aquatic life in these streams.  This pollution may present an imminent and substantial endangerment to the environment as that term is used in Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).  In addition, pollution has accumulated in the groundwater under the power plant site and more pollution is being sprayed onto the site from the irrigation pond.  This pollution may also present an imminent and substantial endangerment to the environment as that term is used in Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).

80.    In accordance with this provision, PacifiCorp is subject to injunctive relief requiring it to abate this endangerment.

**Count 3: PacifiCorp's disposal of solid waste has created an imminent and substantial endangerment in Huntington Creek in violation of RCRA.**

81.    The allegations set forth in Paragraphs 1 through 80, as well as Exhibit A, are incorporated herein by reference.

82.    In the latest draft of Utah's list of impaired waters, Huntington Creek is not meeting water quality standards for TDS and temperature, and thus is listed as impaired for these pollutants.  The TDS impaired the Creek's designated use for agriculture, while the temperature impaired the Creek's designated use for aquatic life.  PacifiCorp's management of the coal combustion waste contributes to the impairment for TDS in two ways: removal of natural fresh water for dilution by dredging, filling and/or intercepting Landfill Canyon and West End Canyon; and, by adding dissolved salts like sulfate that would not have otherwise been there.  In turn, this impairment may present an imminent and substantial danger to the environment.

83.    As discussed above, pollution from coal combustion wastes disposed or stored on the power plant site have polluted the streams in Landfill Canyon and West End Canyon.  This led to PacifiCorp intercepting all of the flow of these streams and using that flow for irrigation. But for the pollution caused by the management of the coal combustion wastes, these streams would be unpolluted and would be flowing to Huntington Creek.  Taking away diluting fresh water means that dilution of the salts that are already in Huntington Creek at this point does not occur.

84.    As discussed above, PacifiCorp's management of coal combustion wastes has added salts like sulfate to the groundwater.  Groundwater discharges from the research farm area

into Huntington Creek and affects the water quality in the Creek. The addition of salts in the groundwater discharge to Huntington Creek makes it more saline. This has been verified through various measurements. In a site visit on May 5, 2015, the upstream conductivity was 398 microsiemens/cm, while the conductivity downstream of the research farm, but above other inflows, was 432 microsiemens/cm. Similarly, conductivity consistently increases between H-1 and H-2, the upstream measurement points in Huntington Creek and UPL-9, the downstream monitoring point.

85.     Based on information and belief, it is likely that additional pollutants added to Huntington Creek include arsenic, chromium, cobalt, fluoride, iron, manganese, molybdenum, thallium, and selenium. Arsenic may be ingested by fish that could be consumed by humans in a manner that may cause or contribute to an imminent and substantial endangerment to human health. Other pollutants, including arsenic, iron and selenium, are harmful to fish and other aquatic life and therefore may cause or contribute to an imminent and substantial endangerment to the environment.

86.     Pollution from the contaminated groundwater is reaching Huntington Creek via groundwater flow in levels that contribute to excessive levels of dissolved salts and other waste constituents in Huntington Creek. This pollution may present an imminent and substantial endangerment to the environment as that term is used in Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).

87.     In accordance with this provision, PacifiCorp is subject to injunctive relief requiring it to abate this endangerment.

**Count 4: PacifiCorp is violating Section 301(a) of the Clean Water Act by discharging pollutants from a point source (retaining wall discharge) into Huntington Creek without a permit.**

88.     The allegations in Paragraphs 1-87, as well as Exhibit A, are incorporated herein by reference.

89.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of a permit, such as a NPDES permit issued by EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

90.     Section 505(a) of the CWA, 33 U.S.C. § 1365(a), authorizes any "citizen" to "commence a civil action on his own behalf. . . against any person ... who is alleged to be in violation of .... an effluent standard or limitation under this chapter."

91.     Section 505(f) of the CWA, 33 U.S.C. § 1365(f), defines an "effluent standard or limitation under this chapter," for purposes of the citizen suit provision in Section 505(a) of the CWA, 33 U.S.C. § l365(a), to mean, among other things, an unlawful act under Section 301(a), 33 U.S.C. § 1311 (a), of the CWA and "a permit or condition thereof issued" under Section 402, 33 U.S.C. § 1342, of the CWA.

92.     In an action brought under Section 505(a) of the CWA, 33 U.S.C. § 1365(a), the district court has jurisdiction to order the defendant or defendants to comply with the CWA and to assess civil penalties under Section 309(d) of the CWA, 33 U.S.C. § 1319(d).

93.     Under Section 505(d) of the CWA, 33 U.S.C. § 1365(d), the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

94.     Representatives of the Plaintiffs have observed a pipe believed to be located on the Huntington power plant property discharging into Huntington Creek.  The pipe was located immediately above a retaining wall along Huntington Creek.  The retaining wall at issue is located just downstream of the Huntington power plant cooling water intake on Huntington Creek.   The retaining wall discharge flows out of the pipe, makes contact with the retaining wall, then contacts soil and rocks at the base of the retaining wall, before flowing into Huntington Creek.  There is a noticeable staining of the retaining wall where the discharge makes contact with the wall. A photograph of the pipe discharging into Huntington Creek can be found on page 10 of Exhibit A hereto.

95.     Based on information and belief, the source of the discharge is believed to be related to the raw water pond (also known as a settling pond) on the Huntington power plant.  In its 2004 UPDES permit application to the State of Utah, PacifiCorp acknowledged a discharge from the raw water pond into Huntington Creek.  According to the permit application, the sources of liquids in the raw water pond include: power plant process water, Deer Creek Mine discharge water, and Huntington Creek water. Based on the 2004 permit application, the discharge to Huntington Creek from raw water pond contains pollutants, including, but not limited to: total dissolved solids ("TDS"), total suspended solids ("TSS"), heat/temperature, ammonia, fluoride, nitrate, mercury, nitrogen, phosphorus, sulfate, sulfide, sulfites, barium, boron, iron, and selenium.  These substances are "pollutants" as defined by the CWA, 33 U.S.C. § 1362(6).

96.     The retaining wall discharge is a "point source" discharge as defined by the CWA, 33 U.S.C. §1362(14), because it is conveyed to Huntington Creek by a discrete man-made conveyance (a pipe).

97.     The activity identified in paragraphs 94-96 above constitutes a "discharge of pollutants" as that term is defined at 33 U.S.C. § 1362(12) and 40 C.F.R. § 122.2.

98.     Huntington Creek is a "navigable water" as that term is defined under 33 U.S.C. §1362(7) of the CWA, 40 C.F.R. § 122.2, EPA guidance and policy, as well as Utah state law. PacifiCorp has previously applied for, and obtained, permit(s) to discharge pollutants into Huntington Creek, thereby admitting that Huntington Creek is a "navigable water" under the CWA.

99.     Based on information and belief, PacifiCorp does not have a permit, and is not authorized, under Section 301(a) and Section 402 of the CWA to discharge pollutants from any point source into Huntington Creek.

100.     Based on information and belief, PacifiCorp owns and/or operates the retaining wall discharge, conveyance pipe, or the property upon which the retaining wall discharge is located.

101.     Pursuant to 33 U.S.C. § 1362(5), PacifiCorp is a "person" subject to the citizen suit provisions of the CWA.

102.     PacifiCorp has violated Section 301(a) of the CWA by illegally discharging pollutants from a point source (the retaining wall discharge) into Huntington Creek without a permit on each and every day from at least the past 5 years to the present, and continuing into the future until it obtains such a permit.

**Count 5: PacifiCorp is violating Section 301 and/or its industrial storm water discharge permit, SWMP and/or SWPPP by discharging pollutants from its coal storage pile into Huntington Creek and/or Fish Creek in violation of the permit and/or without a permit.**

103.     The allegations in Paragraphs 1-102, as well as Exhibit A, are incorporated herein by reference.

104.     PacifiCorp has created a large coal storage pile across Highway 31 east of the power plant (east coal pile).  The east coal storage pile is located along Burma Road approximately 1 mile from the Highway.  The east coal storage pile regularly receives daily deliveries of coal, which is trucked to the east coal storage pile from neighboring coal mines. The coal is dumped onto the pile.  The east coal storage pile has grown considerably in size since the adjacent Deer Creek coal mine has ceased, or reduced, operations.  According to PacifiCorp's March 2014 Storm Water Pollution Prevention Plan (SWPPP) for the Huntington Plant, there are two other coal piles located near the power plant and adjacent to Deer Creek.

105.     On or about January 30, 2014, PacifiCorp submitted to the state of Utah a new Notice of Intent (NOI) for Coverage Under the UPDES General Multi-Sector Storm Water Permit for Discharges Associated with Industrial Activity, Permit UTR 266299 for the Huntington plant.  Coverage under this storm water permit became effective on January 30, 2014, the date PacifiCorp's NOI was submitted to Utah.

106.     PacifiCorp's NOI identified two receiving waters for its discharge of storm water: Huntington Creek and Deer Creek. PacifiCorp's NOI indicates that it did not have any other existing UPDES permits.  PacifiCorp's NOI sought authorization to discharge storm water from the following areas of industrial activity at the Huntington plant: landfills and land application sites (Sector L) and Steam Electric Power Generating Facilities (Sector O).

107.     The NOI states that Sector O includes "coal handling areas" and states "[s]torm water discharges from coal pile runoff subject to numeric limitations are eligible for coverage under this permit, but are subject to the limitations established by 40 C.F.R. 423."

108.    40 C.F.R. § 423 establishes an effluent limit for Total Suspended Solids ("TSS") for coal pile runoff of 50 mg/l. 40 C.F.R. § 423.12(b)(9). In addition, Appendix II.0 of the Multi-Sector Storm Water Permit for Discharges Associated with Industrial Activity also establishes a monitoring benchmark cut-off concentration for Total Recoverable Iron of 1.0 mg/l.  Sector O Appendix II.O, paragraph 5.a, Table O-1.

109.    PacifiCorp has submitted discharge monitoring reports ("DMRs") to the State of Utah containing monitoring results of its sampling of its storm water discharges.  PacifiCorp's storm water DMR for the second quarter of 2011 reveals exceedances of the benchmark cut-off concentration for Total Recoverable Iron (permit limit of 1.0 mg/l) for samples taken on May 18, 2011 at Outfall storm water A (2.2 mg/l) and storm water B (5.46 mg/l).  PacifiCorp's March 2014 SWPPP does not identify the location of storm water outfalls A or B.

110.    On May 5, 2015, representatives of the Plaintiffs observed storm water discharging from the east coal pile down Burma Road and into a ravine adjacent to Fish Creek. These visual observations of storm water discharges from the east coal storage pile on May 5, 2015 revealed "obvious indicators" of storm water pollution, including "color…clarity, floating solids, settled solids, [and] suspended solids."  Sector O Appendix II.O, paragraph 5. c. 4. c.

111.    Appendix O of the storm water permit requires PacifiCorp to monitor, sample, and report storm water quality data to Utah on an annual basis.  Based on information and belief, PacifiCorp has failed to submit this information to Utah in 2014 and 2015 despite the existence of storm water runoff from the east coal pile.

112.    Based on information and belief, Plaintiffs allege that PacifiCorp is violating its Industrial Storm Water Discharge Permit by: exceeding the TSS limit for coal pile runoff in 40 C.F.R. §423, exceeding the Total Recoverable Iron limitation for coal pile run off, failing to

"manage storm water runoff in a manner that reduces pollutants in storm water discharges from the site" as required by Sector O, Appendix II.O paragraph 3. g. 5, and failing to monitor, sample, analyze and submit water quality data from its coal pile runoff in 2014 and 2015.  Based on information and belief, Plaintiffs allege that PacifiCorp has violated each of these storm water effluent limits and requirements each and every day of a discharge from the commencement of coverage under the permit to date.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to:

1.     Declare that PacifiCorp is in violation of RCRA and the CWA.

2.     Enjoin PacifiCorp from further violating RCRA and the CWA.

3.     Order PacifiCorp to assess and remediate the harm caused by its violations of the RCRA, including but not limited to the following:

   a.   Preventing leachate from forming by preventing water from penetrating into the waste by placing an impermeable cap on the waste and cutting off any groundwater flow through the waste;

   b.   Preventing existing leachate and/or contaminated groundwater from reaching the local streams; and

   c.   Conducting a prompt and complete investigation and delineation of all contamination emanating from the Huntington plant;

   d.   Abating any contamination that could lead to further pollution of local streams;

   e.   Restoring the flow of the streams on the power plant site so that their habitat value and stream functions recover to their former levels; and,

     f.   Disposing of all coal combustion wastes in an appropriately permitted lined landfill that has effective leachate control.

4.     Order PacifiCorp to cease any unpermitted discharges of pollutants from point sources at the Huntington power plant into navigable waters.

5.     Order PacifiCorp to obtain a permit for any future discharge of pollutants from point sources at the Huntington power plant into navigable waters.

6.     Order PacifiCorp to cease any discharges of pollutants into navigable waters that are in violation of the terms and conditions of any of its discharge permits.

7.     Order PacifiCorp to remove any dredged and fill material illegally discharged into Landfill Canyon and West End Canyon, order PacifiCorp to discontinue the interception of these streams, order PacifiCorp to cease the conveyance of these streams to the evaporation pond and the discharge of these streams onto the research farms, and order PacifiCorp to restore these streams to their original condition as to prevent contamination by the Huntington power plant operations and allow these streams to naturally flow to Huntington Creek.

8.     Assess appropriate civil penalties against PacifiCorp for each and every violation of the CWA, as well as each and every day of such violations of the CWA, pursuant to 33 U.S.C. § 1365(a) and § 1319(d).

9.     Award Plaintiffs the cost of litigation, including reasonable attorney's fees, costs, and expert fees and expenses, pursuant to 33 U.S.C. § 1365(d) and 42 U.S.C. § 6972(e).

10.    Retain jurisdiction to ensure compliance with its decree; and

11.    Grant such other relief as the Court deems just and proper.


DATED:     February 12, 2016

Respectfully submitted,


  /s /  Charles Dubuc
Charles R. Dubuc
Utah Bar No. 12079
Western Resource Advocates
150 S 600 E #2A, Salt Lake City, UT 84102
(801) 487-9911
rob.dubuc@westernresources.org


/s/  Richard Webster
(Signed by Filing Attorney with permission of Plaintiff Attorney)
        /s/ Charles Dubuc
Richard Webster*
DC Bar No. 1012359
Public Justice
1825 K Street, NW Suite 200
Washington, D.C.
(202) 797-8600
rwebster@publicjustice.net


/s/_John Barth
(Signed by Filing Attorney with permission of Plaintiff Attorney)
        /s/ Charles Dubuc
John Barth* Attorney at Law
Colorado Bar No. 22957
P.O. Box 409
Hygiene, CO 80533
(303) 774-8868
barthlawoffice@gmail.com


*Application for admission *pro hac vice* pending.

*Attorneys for HEAL Utah and Sierra Club*