E. BLAINE RAWSON (7289)
CALVIN R. WINDER (14369)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, UT 84145-0385
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
brawson@rqn.com
cwinder@rqn.com

*Attorneys for Defendant PacifiCorp*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HEAL UTAH and SIERRA CLUB,<br><br>Plaintiffs,<br><br>v.<br><br>PACIFICORP,<br><br>Defendant, | **DEFENDANT PACIFICORP'S MOTION TO DISMISS COUNTS 2 AND 3 OF PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Civil No. 2:16-cv-00120-PMW<br><br>Magistrate Judge Paul M. Warner |

PacifiCorp files this Motion to Dismiss Counts 2 and 3 of the First Amended Complaint (Dkt. 3, "Complaint") for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).  As explained more fully below, this Court lacks jurisdiction and/or should decline to exercise jurisdiction to hear the claims asserted by Plaintiffs as they are duplicative of – and a collateral attack upon – the State of Utah groundwater permitting program.

In all of its twenty-eight pages, the Complaint fails to mention the determinative fact relating to the Plaintiffs'' allegations in Counts 2 and 3 – the existence of the groundwater permit

that regulates the very activities that Plaintiffs complain about.  The Complaint also inexplicably leaves out the equally important fact that the State of Utah carefully oversees compliance with the groundwater permit though a comprehensive groundwater permit program.  If this Court were to find that the discharges under the state permitting program constituted a violation of federal hazardous waste laws, the groundwater discharge permit would need to be rewritten or deemed void and the State of Utah's permitting program would be thrown into disarray in that *every discharge permit* in the state would be subject to de facto federal judicial review.

## TABLE OF CONTENTS

Introduction ............................................................................................................. 5

Background ............................................................................................................. 6

I.    Utah Employs a Comprehensive and Complex Program to Regulate
Groundwater Discharge. .............................................................................. 6

    A.    The Permit Application Process Requires the Collection and
Presentation of Detailed Hydrogeological Data and Monitoring
Proposals. .......................................................................................... 7

        1.    The Applicant Must Define the Location, Nature, and
Quality of the Discharge. ................................................... 7

        2.    The Applicant Must Demonstrate Control of the Discharge. ......... 7

        3.    The Applicant Must Propose Sampling, Monitoring, and
Compliance Plans. ............................................................. 8

        4.    The Applicant Must Include a Plan for Contingency,
Inspection, Closure, Post Closure & Management. ....................... 9

    B.    Utah's Permit Issuance Process Requires Rigorous Review, Invites
Public Comment, and Offers an Avenue for Challenges. ......................... 10

    C.    The Huntington Groundwater Discharge Permit is a Product of the
Above Comprehensive State Permitting Program. ................................... 12

        1.    PacifiCorp Must Monitor Surface and Groundwater. ................... 12

        2.    PacifiCorp Must Report its Monitoring Results to the
DWQ. ........................................................................... 13

        3.    PacifiCorp Must Demonstrate Compliance with the
Groundwater Discharge Permit to the DWQ. ............................... 13

        4.    PacifiCorp Must Employ Certain Best Management
Practices. ........................................................................ 13

        5.    The Permit Explicitly Addresses the Research Farm. .................. 14

        6.    PacifiCorp Faces Penalties for Violating the Permit. .................. 14

II.    Counts 2 and 3 of the Complaint Ignore the Groundwater Discharge
Permit. ........................................................................................... 15

Argument and Citation to Authority ............................................................... 15

    I.      Standard of Review ....................................................................... 15

    II.     The Court Should Abstain Jurisdiction Under *Burford*. ........................ 17

    III.    The Court Should Abstain on Primary Jurisdiction Grounds. ............................ 23

        1.      Expertise of Utah DEQ ........................................................ 23

        2.      Potential For Conflicting Orders ............................................ 24

        3.      Whether Agency Proceedings Have Already Begun. ............................. 24

        4.      Diligence ........................................................................ 24

        5.      Injunctive Relief ............................................................... 25

    IV.    Plaintiffs' Challenge is an Improper Collateral Attack Given They Failed to Exhaust Administrative Remedies. ................................................... 25

Conclusion ...................................................................................... 27

## Introduction

On August 2, 2011, the State of Utah's Division of Water Quality ("DWQ") renewed PacifiCorp's groundwater discharge permit for the Huntington Power Plant (the "Groundwater Discharge Permit"). Totaling more than 70 pages, the Groundwater Discharge Permit "covers *all* facilities and activities at the Huntington Power Plant site which have a potential to discharge contaminants to groundwater," including the facilities and activities that are the target of Plaintiffs' current suit.[1] *See* Groundwater Discharge Permit at p. 2, § I.B. (emphasis added) attached hereto as <u>Exhibit A</u>. The Groundwater Discharge Permit does not authorize direct discharges to surface waters and the Huntington Plant operates as a no-discharge facility under that program. Accordingly, the Permit governs *all* potential discharges made from the Plant.

In this case, Plaintiffs essentially are asking the Court to void the very activities permitted by the Groundwater Discharge Permit and to take over from the State of Utah the regulation of these activities. As explained below, the claims made in Counts 2 and 3 involve issues and concerns that are specifically and comprehensively covered and authorized by Utah's groundwater permitting program and by the Groundwater Discharge Permit issued to PacifiCorp.

The Groundwater Discharge Permit expires in August 2016, and it is currently up for renewal. Before the Groundwater Discharge Permit was issued, the State provided an opportunity for any member of the public, including the Plaintiffs, to comment on the proposed Groundwater Discharge Permit. Plaintiffs chose not to do so. *See* Permit at Cover Letter (noting that no comments were received). Now, the issuance process for a renewal permit is currently

---

[1] The Discharge Permit explicitly identifies the following facilities and activities referenced in Plaintiffs' complaint: land application of waste water at the Research Farm, the old and new combustion waste landfills, coal storage and blending areas, handling of wastewater, and several ponds and reservoirs associated with the plant.

under way.  As explained below, Plaintiffs can raise each and every one of their concerns reflected in Counts 2 and 3 in the public comment process and, if not resolved to their satisfaction, they may challenge the permit's reissuance administratively and then in Utah state court.

Instead, Plaintiffs ask this Court to bypass and disrupt Utah's regulatory authority by considering their claims in a federal lawsuit under the Resource Conservation and Recovery Act ("RCRA").  Although undisputedly authorized by the Groundwater Permit, Plaintiffs claim in Counts 2 and 3 of the Complaint that PacifiCorp's groundwater discharge activities represent an "imminent and substantial endangerment" under RCRA (the "RCRA Counts").

As detailed below, the RCRA Counts are an improper collateral challenge to the issuance of the Groundwater Discharge Permit that asks this Court to void or rewrite a permit lawfully issued by the State of Utah.  Federal courts have long recognized the problems of interfering with a state's authority in regard to environmental permitting and this Court should join their ranks by abstaining from accepting jurisdiction over the improper RCRA Counts under both the *Burford* and Primary Jurisdiction doctrines, and/or dismiss Counts 2 and 3 for failure to exhaust administrative remedies related to the Groundwater Discharge Permit.

## Background

## I.     Utah Employs a Comprehensive and Complex Program to Regulate Groundwater Discharge.

The Utah Water Quality Act, Utah Code Ann. § 19-5-101 et seq., makes it unlawful for "any person" to discharge any pollutant to "waters of the state" without a permit from the Utah DWQ.  *Id*. § 19-5-107.  "Waters of the state" includes surface and underground waters.  *Id*. § 19-5-102(25).  *See also Living Rivers v. U.S. Oil Sands, Inc.*, 344 P.3d 568, 569 (Utah 2015).

Pursuant to its authority under the Water Quality Act, the DWQ has "promulgated extensive

rules prescribing the terms and conditions for issuance of a discharge permit."  *Living Rivers*,

344 P.3d at 569.  Those rules contain numerous legal and technical requirements that an

applicant for a Groundwater Discharge Permit, like PacifiCorp, must follow.

> **A.**     **The Permit Application Process Requires the Collection and Presentation of Detailed Hydrogeological Data and Monitoring Proposals.**

> > **1.**     **The Applicant Must Define the Location, Nature, and Quality of the Discharge.**

The application for a Groundwater Discharge Permit must be prepared under the

direction, and bear the seal of, a professional engineer or professional geologist.  Utah Admin.

Code R. 317-6-6 (6.3) (R).  It must contain a host of information related to the location, nature,

and quality of water flows coming from the site, including:

- A plat map showing all water wells, including the status and use of each well, Drinking Water source protection zones, topography, springs, water bodies, drainages, and man-made structures within a one-mile radius of the discharge. The plat map must also show the location and depth of existing or proposed wells to be used for monitoring groundwater quality.

- Geologic, hydrologic, and agricultural description of the geographic area within a one-mile radius of the point of discharge, including soil types, aquifers, groundwater flow direction, groundwater quality, aquifer material, and well logs.

- The type, source, and chemical, physical, radiological, and toxic characteristics of the effluent or leachate to be discharged; the average and maximum daily amount of effluent or leachate discharged, the discharge rate, and the expected concentrations of any pollutant in each discharge or combination of discharges.

Utah Admin. Code R. 317-6-6 (6.3) (D-F).

> > **2.**     **The Applicant Must Demonstrate Control of the Discharge.**

The applicant must also produce sufficient information to show that the discharge "can be

controlled and will not migrate into or adversely affect the quality of any other waters of the

state, including the applicable surface water quality standards, that the discharge is compatible

with the receiving groundwater, and that the discharge will comply with the applicable class

TDS [Total Dissolved Solids] limits, groundwater quality standards, class protection levels or an

alternate concentration limit proposed by the facility."  Utah Admin. Code R. 317-6-6 (6.3) (G).

### 3. The Applicant Must Propose Sampling, Monitoring, and Compliance Plans.

A proposed sampling plan and analysis monitoring plan that conforms to U.S.

Environmental Protection Agency ("EPA") *Guidance for Quality Assurance Project Plans*[2] must

also be included in the application.  Utah Admin. Code R. 317-6-6 (6.3) (I).  This sampling plan

and analysis monitoring plan must detail:  1) groundwater monitoring to determine groundwater

flow direction and gradient, background quality at the site, and the quality of groundwater at the

compliance monitoring point;  2) installation, use and maintenance of monitoring devices;

3)  description of the compliance monitoring area defined by the compliance monitoring points

including the dimensions and hydrologic and geologic data used to determine the dimensions;

4) monitoring of the vadose zone; 5) measures to prevent groundwater contamination after the

cessation of operation, including post-operational monitoring; 6) monitoring well construction

and groundwater sampling which conform to, where applicable, to the EPA *RCRA Ground*

*Water Monitoring Technical Enforcement Guidance Document* (1986);[3] 7) description and

---

[2]  The EPA *Guidance for Quality Assurance Project Plans* is a 111 page manual, available at:
https://www.epa.gov/sites/production/files/2015-06/documents/g5-final.pdf.
[3] The 329-page EPA *RCRA Ground Water Monitoring Technical Enforcement Guidance Document* is available at:  https://www.epa.gov/sites/production/files/documents/rcragwguiddoc-rpt_0.pdf.  Additionally, the monitoring well construction and groundwater sampling must conform, where applicable to: the Handbook of Suggested Practices for Design and Installation of Ground-Water Monitoring Wells (EPA/600/4-89/034, March 1991), ASTM Standards on Ground Water and Vadose Investigations (1996), Practical Guide for Ground Water Sampling EPA/600/2-85/104, (November 1985). UTAH ADMIN. CODE r. 317-6-6 (6.3) (I) (6).

justification of parameters to be monitored; 8) quality assurance and control provisions for monitoring data.  Utah Admin. Code R. 317-6-6 (6.3) (I) (1-10).

A compliance sampling plan must also be included, which in addition to a Sampling Plan and Analysis Monitoring Plan must include, where appropriate, provisions for sampling of effluent and for flow-monitoring in order to determine the volume and chemistry of the discharge onto or below the surface of the ground and a plan for sampling compliance monitoring points and appropriate nearby water wells.[4]  Utah Admin. Code R. 317-6-6 (6.3) (L).

### 4.      The Applicant Must Include a Plan for Contingency, Inspection, Closure, Post Closure & Management.

Finally, the application must contain: a Contingency Plan for regaining and maintaining compliance with the permit limits and for reestablishing best available technology as defined in the permit; methods and procedures for inspections of the facility operations and for detecting failure of the system; and a closure and post-closure management plan demonstrating measures to prevent groundwater contamination during the closure and post-closure phases of an operation.  Utah Admin. Code R. 317-6-6 (6.3) (N, O, S).

---

[4] Sampling and analytical methods proposed in the application must conform with the "most appropriate methods specified" in the following references: (1)  Standard Methods for the Examination of Water and Wastewater, twentieth edition, 1998; Library of Congress catalogue number: ISBN: 0-87553-235-7. (2)  E.P.A. Methods, Methods for Chemical Analysis of Water and Wastes, 1983; Stock Number EPA-600/4-79-020. (3)  Techniques of Water Resource Investigations of the U.S. Geological Survey, (1998); Book 9. (4)  Monitoring requirements in 40 CFR parts 141 and 142, 2000 ed., Primary Drinking Water Regulations and 40 CFR parts 264 and 270, 2000 ed. (5)  National Handbook of Recommended Methods for Water-Data Acquisition, GSA-GS edition; Book 85 AD-2777, U.S. Government Printing Office Stock Number 024-001-03489-1. Utah Admin. Code R. 317-6-6 (6.3) (L).

**B.      Utah's Permit Issuance Process Requires Rigorous Review, Invites Public Comment, and Offers an Avenue for Challenges.**

Before issuing a permit, the Director of the Utah Department of Environmental Quality ("DEQ") must publish a "notice of intent to approve" a discharge permit in a newspaper in the local area and invite public comment.  Utah Admin. Code R. 317-6-6 (6.5).  The public comment period must last between thirty and sixty days.  *Id*.  Following the comment period, the Director of DEQ may issue the permit only after he or she has determined that:

1.  the applicant demonstrates that the applicable class Total Dissolved Solids limits, groundwater quality standards and protection levels will be met;

2.  the monitoring plan, sampling and reporting requirements are adequate to determine compliance with applicable requirements;

3.  the applicant utilizes treatment and discharge minimization technology commensurate with plant process design capability and similar or equivalent to that utilized by facilities that produce similar products or services with similar production process technology; and,

4.  there is no current or anticipated impairment of present and future beneficial uses of the groundwater.

Utah Admin. Code R. 317-6-6 (6.4)(C).[5]

Once a discharge permit has been issued, a person may file a Petition for Review under the Utah Administrative Procedures Act.  Utah Code Ann. § 63G-4-301; Utah Code Ann. § 19-1-301.5; Utah Admin. Code R. 305-7-203.  The filing of a Petition for Review then triggers an "agency or superior agency" review of the order within a reasonable time.  Utah Code Ann. §63G-4-301(3).  To assist in review, any party may request for appointment of an Administrative Law Judge ("ALJ").  Utah Admin. Code R. 305-7-206.  Following appointment of the ALJ, the

---

[5] This is the standard applicable to "existing facilities," like the Huntington Plant.  A different standard applies to new facilities.

Administrative Record[6] must be filed within forty days.  *Id*.  Dispositive motions can then be

filed, briefing on the merits can be submitted and oral arguments can be heard.  *Id*.; Utah Code

Ann. §63G-4-301(4).

      Following briefing and oral argument, if held, the Executive Director of the DEQ must

issue a written order on review within a reasonable time.  The order is formal and must contain:

(i) a designation of the statute or rule permitting or requiring review; (ii) a statement of the issues

reviewed; (iii) findings of fact as to each of the issues reviewed; (iv) conclusions of law as to

each of the issues reviewed; (v) the reasons for the disposition; (vi) whether the decision of the

presiding officer or agency is to be affirmed, reversed, or modified, and whether all or any

portion of the adjudicative proceeding is to be remanded; (vii) a notice of any right of further

administrative reconsideration or judicial review available to aggrieved parties; and (viii) the

time limits applicable to any appeal or review.  Utah Code Ann. § 63G-4-301(6); Utah Admin.

Code R. 305-7-206(7)(c).

      If a party is not satisfied with the administrative order, the party may elect to challenge

the decision in the state courts of Utah.  In this State, the Utah Court of Appeals has jurisdiction

to review all final agency action resulting from formal adjudicative proceedings.  Utah Code

Ann. § 63G-4-403(2); *Id*. § 78A-4-103(2)(a)(i).  In turn, decisions of the Utah Court of Appeals

may be further challenged in the Utah Supreme Court.  Utah Code Ann. § 78A-3-102(3)(a).

---

[6] The "Administrative Record" is a defined term and must include, among other things, the
permit application, draft permit, and final permit; each statement of basis, fact sheet, engineering
review, or other substantive explanation as the basis for the permit, a notice and record of each
public comment, the notice and record of each public hearing, responses to comments that are
part of the basis for issuing the permit.  Utah Admin. Code R. 305-7-209.

**C.   The Huntington Groundwater Discharge Permit is a Product of the Above Comprehensive State Permitting Program.**

Since 2006, PacifiCorp's Huntington Plant has held a Utah DEQ Groundwater Discharge Permit.  The current version of the permit was issued on August 2, 2011, and it expires in just a few months – on August 2, 2016.  The Groundwater Discharge Permit "covers *all* facilities and activities at the Huntington Power Plant site which have the potential to discharge contaminants to groundwater."  Permit at p. 2, § I.B. (emphasis added).  Currently, an application is pending before the Utah DEQ for a permit renewal.[7]  A copy of the application package is attached hereto as Exhibit B.  A notice has not yet been published in the newspaper seeking public comment, but once it has been published, Plaintiffs and all others will be allowed to draft and file written comments expressing their concerns.

**1.   PacifiCorp Must Monitor Surface and Groundwater.**

Section I.A. of the Huntington Groundwater Discharge Permit lists sixteen groundwater monitoring wells that are located on the site, showing the average background concentrations of the elements Boron and Nitrate, and of Total Dissolved Solids (Table 1), and protection levels for Nitrate and TDS (Table 2).  Each of these sixteen wells plus an additional five (for a total of 21) must be sampled semi-annually for TDS, Major Ions (Na, K, Mg, Ca, Cl, $SO_4$, alkalinity),[8] nitrate + nitrite,  boron, pH, specific conductance, water level, and temperature.  Permit at p.4-5, § I.E.2.  These elements are the same as those listed in the Complaint.  See Compl. ¶65.

In addition to the groundwater sampling, the Huntington Permit requires surface water sampling at eight locations in and around the plant.  Permit at p. 5, §§ I.E3, Appx. B.  These

[7] A permittee must apply for a renewal groundwater discharge permit at least 180 days before expiration of the current permit. Utah Admin. Code R. 317-6-6 (6.7)
[8] Na is the periodic table symbol for sodium.  K is for potassium, Mg for magnesium, Ca for calcium, and Cl for chlorine.  $SO_4$ is sulfate.

12

locations are situated up-gradient, midpoint, and down-gradient of the plant to effectively track

the water quality, and they are sampled for the same constituents listed above. *Id.*

### 2.    PacifiCorp Must Report its Monitoring Results to the DWQ.

The Huntington Groundwater Discharge Permit requires the plant to report the results of

its groundwater and surface water sampling to the Utah DWQ twice per year (on August 15 and

February 15). Permit p. 6, § I.F.1. These reports form the basis of Plaintiffs' allegations. *See*

Compl. ¶¶ 65-67. In addition to reporting the data collected, the Permit requires that PacifiCorp

calculate the amount of dissolved solids passing surface water monitoring points in tons per day

for each sampling event and report this information to the DWQ. Permit p. 6, §I.F.1.

### 3.    PacifiCorp Must Demonstrate Compliance with the Groundwater Discharge Permit to the DWQ.

If any groundwater sample exceeds the protection levels for the well, PacifiCorp is

required to notify DWQ verbally within one business day, followed by a written notification

within five business days. Permit at p. 7, §§ I.G.2, I.F2. It must then immediately re-sample the

well(s) for all parameters and then conduct monthly sampling until the parameter no longer

exceeds the protection level. *Id.* With respect to surface water, water quality downstream of the

Plant must not exceed the standards contained in the Utah Pollutant Discharge Elimination

System ("UPDES") permit that the Plant formerly maintained.[9]

### 4.    PacifiCorp Must Employ Certain Best Management Practices.

Appendix A to the permit contains the Best Management Practices ("BMPs") that are

---

[9] PacifiCorp withdrew its application to renew the UPDES Permit because no direct discharges to surface waters were occurring, and the UPDES Permit expired by its own terms. The limits listed within the UPDES Permit, however, have been incorporated into the Groundwater Permit as described above.

required to "prevent or minimize the potential for degradation of the surface and groundwater resources."  Permit at p. 17-26.  The BMPs are in addition to the Plant's Stormwater Pollution Prevention Plan ("SWPPP"), Spill Prevention Control and Countermeasures Plan, Solid and Hazardous Waste Management Plan, Waste Water Land Application Plan, and Site Wide Monitoring and Sampling Plan.  (A copy of those plans, totaling 351 pages, is attached hereto as Exhibit C).[10]

The BMPs are drafted for each of the relevant areas of the Plant, including the Scrap Yards, the New Combustion Waste (Ash ) Landfill, the Waste (Ash) Landfill, the Research Farm, the Process Water Ponds, the Coal Pile, and other Plant Facilities.  In addition to the required minimum monthly inspection of all Plant facilities, Permit at 17, the BMPs cover a wide range of important procedures that must be implemented.  For example, the BMPs require the minimization of fugitive dust, the control of stormwater runoff, and the inspection of ash hauling vehicles.

### 5.      The Permit Explicitly Addresses the Research Farm.

Appendix D to the Permit contains a lengthy Plan for the procedures governing the operation, maintenance, and recordkeeping of the Research Farm.  It is used to determine the rate of application of water to the fields through calculations of soil moisture and evapotranspiration. It covers plans to prevent wastewater escaping PacifiCorp's property into surface water or percolating through the soil and into the groundwater system.

### 6.      PacifiCorp Faces Penalties for Violating the Permit.

Penalties up to $10,000 per day may be assessed for violations of the permit or permit

---

[10] The Waste Water Land Application Plan is included as Appendix D to the Groundwater Permit and the Site Wide Sampling and Monitoring Plan is included as Appendix E.  They are not included in Exhibit C, or the page totals represented above.

condition.  Permit at p. 12, § III. B.

**II.     Counts 2 and 3 of the Complaint Ignore the Groundwater Discharge Permit.**

In the face of the complex processes and extremely detailed requirements of the

Groundwater Discharge Permit, Plaintiffs maintain that PacifiCorp has violated RCRA due to

"contaminated groundwater" reaching various streams in and around the plant, thereby causing

an "imminent and substantial endangerment to health or the environment."  Compl. at ¶¶ 78, 85.

Although the Groundwater Discharge Permit applies on its face to discharges from *all* facilities

and activities at the Huntington Power Plant, Plaintiffs maintain that PacifiCorp's "treatment,

handling, transportation, and disposal of coal ash, flue gas desulfurization, and liquid wastes" is

"reaching local streams via groundwater flow and springs in levels that are environmentally

harmful to aquatic life in these streams," and "may present an imminent and substantial

endangerment to the environment" as that term is used in RCRA, § 42 U.S.C. §6972(a)(1)(B).

Compl. ¶¶77-78, 85.  Plaintiffs also assert two other violations of the RCRA:  "pollution" in the

groundwater itself and "pollution" being "sprayed onto the site from the irrigation pond (which

the Groundwater Discharge Permit refers to as the Land Application System on the Research

Farm).  Compl. ¶ 78.

As detailed below, this Court should abstain from interfering with Utah's complex

regulatory program to make policy judgments as to the wisdom of the Utah DEQ's issuance of

the Groundwater Discharge Permit which allows PacifiCorp to take the actions that are the

subject of Plaintiffs' RCRA Counts.

## Argument and Citation to Authority

**I.     Standard of Review**

Motions to dismiss based on *Burford* and primary jurisdiction abstention are properly

brought pursuant to Rule 12(b)(1).  *See M.D. v. Perry*, 799 F. Supp. 2d 712, 715 n.3 (S.D. Tex. 2011) ("Courts . . . favor Rule 12(b)(1) when evaluating *Burford* abstention) ; *Hanlin Group, Inc. v. Power Authority of State of New York*, 703 F. Supp. 305, 306 (S.D.N.Y. 1989) (relying on Fed. R. Civ. P. 12(b)(1) to refuse jurisdiction under to the *Burford*);  *Stein v. Legal Adver. Comm. of the Disciplinary Bd.,* 272 F. Supp. 2d 1260, 1263 n.3 (D.N.M. 2003) ("Consideration of a motion to dismiss based on principles of abstention is similar to a motion to dismiss for lack of subject matter jurisdiction.").[11]

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms. First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint.  In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.  *Hansen v. Black*, No. 2:13-cv-736-RJS-PMW, 2014 U.S. Dist. LEXIS 184064, at *2-3 (D. Utah Jan. 14, 2014).

Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends.  When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations.  A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing (if needed) to resolve disputed jurisdictional facts under Rule 12(b)(1).  *Id.*

---

[11]  Some courts have considered abstention doctrines in the context of Rule 12(b)(6). In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the factual  allegations in the complaint, if true, would entitle the plaintiff to a legal remedy. Dismissal is appropriate when the plaintiff can prove no set of facts in support of the claims that would entitle him to relief.  *Utah Gospel Mission v. Salt Lake City Corp.,* 316 F. Supp. 2d 1201, 1223-24 (D. Utah 2004).

**II.      The Court Should Abstain Jurisdiction Under *Burford*.**

Under *Burford v. Sun Oil Co*., 319 U.S. 315 (1943), federal courts should abstain from asserting jurisdiction over claims that primarily concern issues of state law where timely and adequate state-court review is available.  *Burford* abstention is proper if a case: [1] presents difficult questions of state law bearing on problems of substantial public import whose importance transcends the results then at bar; or [2] if its adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.  *New Orleans Pub. Serv. Inc. v. Counsel of New Orleans*, 491 U.S. 350, 361 (1989).   This case is a textbook example of where *Burford* abstention should be applied.

Here, the relief Plaintiffs seek in their RCRA Counts would bypass and disrupt the State of Utah's lawful efforts to regulate groundwater discharges within the state.  As shown below, the alleged improper discharges that Plaintiffs claim present an "imminent and substantial endangerment to the environment," already are governed by provisions of the Groundwater Discharge Permit in these areas:

| Count | Alleged Unlawful Discharges | Discharge Authorized by Groundwater Discharge Permit |
|:-----:|-----------------------------|------------------------------------------------------|
| 2 | Plaintiffs claim, Compl. ¶ 77, that PacifiCorp has polluted groundwater because of the "treatment, handling, transportation, and disposal of" coal ash, FGD, and liquid wastes in six areas: | The Groundwater Discharge Permit governs groundwater discharge for all facilities and activities at the Huntington Power Plant site, which have the potential to discharge contaminants to groundwater, including "land application of waste water at the Research Farm, both the old and new combustion waste landfills, coal storage and blending areas, handling of wastewater, fuels and other industrial chemicals at the plant site, and several ponds and reservoirs associated with the plant."  §I.B. |

| | | |
|---|---|---|
| | | Although using different terminology, §I.B makes clear that the Groundwater Discharge Permit applies to the following areas: |
| | (1) the old ash landfill, Compl.¶ 59; | (1) the old ash landfill (aka "the old combustion waste landfill"); |
| | (2) Landfill Canyon, Compl. ¶¶ 70-71; | (2) Landfill Canyon (aka "the new combustion waste landfill"); |
| | (3) Lacey's Lake, Compl.¶60; | (3) Lacey's Lake (aka "ponds and reservoirs associated with the plant") *See also* Appendix G (detailing closure plan for Lacey's Lake Pond Area); |
| | (4) Duck Pond, Compl. ¶ 61; | (4) Duck Pond (aka "ponds and reservoirs associated with the plant") *See also* Appendix A to Groundwater Discharge Permit at 24-25 (BMPs governing the Duck Pond); |
| | (5) Research Farm, Compl. ¶ 62; and | (5) Research Farm (aka "land application of waste water and the Research Farm") *See also* Appendix D to Groundwater Discharge Permit (governing groundwater discharges to Research Farm), Appendix A to Groundwater Discharge Permit at 21 (BMPs governing Research Farm); and |
| | (6) Rock Garden, Compl. ¶63. | (6) Rock Garden (aka "ponds and reservoirs associated with the plant"). |
| 3 | Plaintiffs claim that PacifiCorp's groundwater discharges have caused "excessive levels of dissolved salts and other waste constituents in Huntington Creek" Compl. ¶ 85. | The Groundwater Discharge Permit governs groundwater for all facilities and activities at the Huntington Power Plant site, which have the potential to discharge contaminates into groundwater §I.B. |

With respect to Count 2, Plaintiffs' allegations regarding discharges in violation of RCRA are part of a system that has already been reviewed and approved by the Utah Department of Environmental Quality and incorporated into the Groundwater Discharge Permit.  If this Court were to grant Plaintiffs' requested relief, these provisions would have to be re-written or simply deemed void.  In its place, this Court would be tasked with developing a new plan for delineation and remediation of groundwater at the Huntington Plant.  In other words, this Court would be stepping into the shoes of the Utah Division of Water Quality.

Count 3 fares no better.  It too is a collateral challenge to the terms and conditions of the Huntington Groundwater Discharge Permit, stating that pollution "from contaminated groundwater is reaching Huntington Creek via groundwater flow in levels" that violate RCRA's imminent and substantial endangerment threshold.  Compl. ¶ 85.  Again, the State of Utah has authorized these groundwater discharges following a full public review in which Plaintiffs could have commented and ultimately challenged.  And, as noted earlier, a permit renewal process is currently underway in which Plaintiffs also have the ability to air their grievances.  This Court should not allow Plaintiffs to disregard the opportunities afforded to them under state law.

In a strikingly similar case – one also raising RCRA allegations when there was a state-issued water discharge permit – a district court within the Tenth Circuit found that *Burford* abstention applied and dismissed such claims.  *See Friends of Santa Fe Cty. v. Lac Minerals*, 892 F. Supp. 1333 (D.N.M. 1995).

In *Lac Minerals*, plaintiffs filed a citizen suit under the Clean Water Act ("CWA") and RCRA against the operators of a gold mine in Santa Fe, New Mexico.  They alleged that the defendants' waste pile was the source of "acid mine drainage," and they asked the court to order the defendants to obtain CWA and RCRA permits to prevent the drainages from posing an

"imminent and substantial endangerment to human health and the environment." *Lac Minerals*, 892 F. Supp. at 1337-38.

As relevant here, the New Mexico Environmental Improvement Division (a predecessor agency to the New Mexico Environmental Department) had issued to the defendants (and renewed several times at five year intervals) a "Discharge Plan" which was "essentially a permit authorizing limited discharges and imposing various operating conditions." *Id*. at 1344.  Much like the Plaintiffs here, one of the plaintiffs' claims in *Lac* was that the acid mine drainage constituted "an imminent and substantial endangerment to the health or the environment" under RCRA. *Id.* at 1347.  The defendants moved to dismiss the claim asserting that the court should abstain based on *Burford* on the grounds that the claim was essentially a collateral attack on the Discharge Plan.  The court granted the request.

Relying on the Fourth Circuit's decision in *Palumbo v. Waste Technologies Indus*., 989 F.2d 156 (4th Cir. 1993), the court explained that, with the Discharge Plan, "New Mexico has taken great care to provide for specialized adjudication of its complicated environmental law scheme." *Id*. at 1348.  It noted that decisions by the relevant New Mexico agency had to be made in administrative adjudications with procedural safeguards, that the plaintiffs could have appealed the agency's decision, and that "Plaintiffs' assertion . . .  is little more than an indirect collateral attack on the [Discharge Plan] adjudication and its present regulatory course."

The court explained:

> A determination by this Court that the [Defendants'] mine site's acid mine discharges pose an imminent and substantial endangerment to health or the environment would be irreconcilable with the [state agency's] determination to allow Defendants  to proceed under [the Discharge Plan].  It would, in short, constitute a serious 'interference with the proceedings or orders of [a] state

> administrative agency' which would prove 'disruptive of state
> efforts to establish a coherent policy.'

*Id.* at 1348-49 (quoting *New Orleans Pub. Serv., Inc.* 491 U.S. at 361).

The same would be true for PacifiCorp's Groundwater Discharge Permit.  If this Court here were to find that the discharges to groundwater under the state permitting program constituted a RCRA violation, the Groundwater Discharge Permit would need to be rewritten (or deemed void) and the State of Utah's permitting program would be thrown into disarray in that *every discharge permit* in the state would be subject to de facto federal RCRA judicial review.

Courts in other jurisdictions have exercised *Burford* abstention in the context of federal suits collaterally challenging state-issued permits.  *See Sugarloaf Citizens Ass'n v. Montgomery Cty.,* 1994 U.S. App. LEXIS 21985, at *24 (4th Cir. Aug. 17, 1994) ("Sugarloaf's complaint, dressed in the raiments of federal claims, does nothing more than resurrect in a different forum objections to a proposed incinerator that have already been litigated before a state ALJ and the Secretary of MDE [the Maryland Department of Environment].  Plaintiffs cannot launch a grapeshot collateral attack on the permitting decisions of an agency--invoking RCRA, the Clean Air Act, [state] hazardous waste laws, and the common law of nuisance--and hope that one of these shots will land them in a federal district court.'" ) (citation omitted); *Jamison v. Longview Power, LLC*, 493 F. Supp. 2d 786, 789 (N.D.W. Va. 2007) ("[T]o the extent that the plaintiffs challenged the permitting decisions of the Ohio EPA, . . . *Burford* required it to abstain because federal court review would disrupt the coherence of and add significant risks and costs to the complex state regulatory scheme.").

As in *Lac*, *Sugerloaf*, and *Jaimson*, the Plaintiffs base their attack on a state-issued permit as a citizen suit under federal law.  As explained above, Utah's Groundwater Discharge Permit

program comprehensively addresses the exact groundwater discharges that the Plaintiffs raise. Because they had a right to appeal (but chose not to) DEQ's actions related to the current permit and can participate (and appeal) the renewal permit, Plaintiff's Complaint is an improper collateral attack.

Utah "cannot be expected to effectively control [water] pollution if it must contend with a federal district court, not as familiar in state regulatory law, second guessing its decisions under the state's regulatory scheme." *Jamison,* 493 F. Supp. 2d at 791; *see also Coal. for Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1195 (6th Cir. 1995) ("[F]ederal adjudication of plaintiffs' claims presented here would be disruptive of Kentucky's attempt to ensure uniformity in its hazardous waste policy."); *Raritan Baykeeper, Inc. v. NL Indus.,* 713 F. Supp. 2d 448, 459 (D.N.J. 2010) ("Given the availability of timely and adequate state-court review of the issues raised in this case, and the danger of interference with the important state policies of Brownfield rehabilitation and regional remediation of river sediments, this Court concludes that abstention under the Burford abstention doctrine is appropriate and shall abstain."); *S. All. for Clean Energy v. Duke Energy Carolinas, LLC*, 2009 U.S. Dist. LEXIS 56733, at *16 (W.D.N.C. July 2, 2009) ("[T]he Court, in the exercise of its discretion, will abstain from further involvement in the case and the review of the T29 [air] permit will be carried out through the specialized State administrative review process.").

Utah has a compelling interest in the quality of its groundwater and maintains a robust administrative and judicial process for citizens to challenge its permitting decisions.  The Court should decline to exercise jurisdiction over Counts 2 and 3 – the RCRA counts – because they are a collateral attack on that state permitting program.

**III.     The Court Should Abstain on Primary Jurisdiction Grounds.**

Under the doctrine of primary jurisdiction, claims may be dismissed pending referral of the issues to a state administrative body for its views.  Courts that have addressed the issue of primary jurisdiction have considered the following factors in making their decision: (1) whether the court is being called upon to consider factual issues outside the conventional experience of judges; (2) whether a defendant could be subject to conflicting orders; (3) whether agency proceedings have already begun; (4) whether the agency has shown diligence in resolving the issue; and (5) the type of relief requested.  *McCormick v. Halliburton Co.,* No. CIV-11-1272-M, 2012 U.S. Dist. LEXIS 46661, at *5 (W.D. Okla. Apr. 3, 2012).  Here, each of the five factors counsels in favor of abstention.

The decision in *McCormick* is instructive because the facts involved state agency involvement in a RCRA case.  There, local citizens sued Halliburton under RCRA for allegedly polluting a site with ammonium perchlorate.  2012 U.S. Dist. LEXIS 46661.  The Oklahoma Department of Environmental Quality ("ODEQ") had entered into a consent order with Halliburton requiring the company to investigate and remediate the potential environmental impacts.  Analyzing the five factors, the court concluded its analysis in a manner that would similarly apply here.

### 1.     Expertise of Utah DEQ

The *McCormick* court found that a RCRA claim "unquestionably raises issues that are outside the conventional experiences of judges and that fall within the special expertise of the [state environmental agency.]"  It is clear from the permitting history of the Huntington Plant, the extensive regulations governing the groundwater discharge permit program, the lengthy Groundwater Discharge Permit and permit application, as well as the years of involvement that

Utah DEQ has with the site, that the Utah DEQ is the expert on the matters central to the RCRA

Counts.  *See also Davis v. Nat'l Coop. Refinery Ass'n*, 963 F. Supp. 990, 997 (D. Kan. 1997)

(Kansas Department of Health and Environment had "special expertise" in primary issue of

remediation raised by RCRA claim).   This factor counsels in favors of abstention.

### 2.        Potential For Conflicting Orders

As the *Lac Minerals* court found, in order for it to rule on the plaintiffs' RCRA claim, it

"would have to assess whether the [acid mine drainage] poses an imminent and substantial

endangerment to human health or the environment--an inquiry which . . . can only be described

as second-guessing the [state agency]" that had already issued a discharge permit.  *Lac Minerals*,

892 F.Supp. at 1349.   Similarly, the *McCormick* court found that there would be "a great

potential for conflicting orders if this Court were to determine an investigatory and remediation

plan independently of the [the state environmental agency]," as the Plaintiffs' Prayer for Relief

here would clearly require. *McCormick,* 2012 U.S. Dist. LEXIS 46661, at *7.  This second factor

counsels in favor of abstention.

### 3.        Whether Agency Proceedings Have Already Begun.

Here, the permit re-issuing process is underway, and a permit issuing process has been

completed in the past that the Plaintiffs could have (and may yet) participate in.  Pursuant to the

existing Groundwater Discharge Permit, PacifiCorp is "obligated to cooperate with the [Utah

DEQ] in investigating and remediating the potential threat to health and the environment from

the contamination at the Site." *Id*. at *7.  This third factor favors abstention.

### 4.        Diligence

Here, the State of Utah has been diligent in following the permitting process and issuing

valid permits.  The Plaintiffs have not been diligent in pursuing their state regulatory,

administrative, and judicial venues for addressing their concerns with groundwater. This fourth

factor favors abstention.

### 5.      Injunctive Relief

Finally, plaintiffs are seeking injunctive relief through their RCRA Claim. "Primary

jurisdiction will often be invoked when a plaintiff seeks injunctive relief, because there is the

greatest likelihood that a court's order will interfere with administrative agency's proceedings."

*McCormick* at *8 (citing *Gold Fields Mining Corp.*, 506 F. Supp. 2d 792, 805 (N.D. Okla.

2007)).

Each of these factors weighs in favor of granting a dismissal due to primary jurisdiction

abstention and this Court should abstain.

## IV.     Plaintiffs' Challenge is an Improper Collateral Attack Given They Failed to Exhaust Administrative Remedies.

Plaintiffs' strategy of using RCRA as a collateral attack on the Groundwater Discharge

Permit is an end-run around the judicial precedent set by the Utah Supreme Court which rejected

this approach. This attempt only highlights why abstention is proper.

In a recent case, the Utah Supreme Court flatly rejected collateral attacks on groundwater

discharge permits in similar circumstances. In *Living Rivers*, 344 P.3d at 572, a discharge permit

had been issued, but no challenges had been filed within the allotted thirty days (citing Utah

Code Ann. § 63G-4-301(1)(a)). Accordingly, as the court noted, Utah law provides that where

"no such request is filed, the agency action is final and conclusive and may not be subject to

collateral attack." *Id*.

In reaching its conclusion, the court underscored "the significance of time limits on

administrative petitions for review." *Id*. The court explained that, "time limits are not just

arbitrary cutoffs.  They are important markers, establishing the point at which a party to an

administrative proceeding may move forward in reliance on the finality of an agency

decision."  *Id*.  As particularly relevant here, the Utah Supreme Court explained that once a

permit becomes final, a permit holder is "entitled to move forward with its development plans in

reliance on the conclusive finality of the Secretary's decision and on the law's bar on collateral

attacks.  Living Rivers' petition would reopen and upset that reliance interest.  Our law

forecloses that move . . . ."  *Id.*

By failing to comment or challenge the permit through the state administrative and

judicial process, Plaintiffs have not even participated in – let alone exhausted – their

administrative remedies.[12]  Under Utah law, a party cannot jump straight to state court when they

did not proceed through the available administrative remedies.  *Republic Outdoor Adver., LC v.

Utah DOT*, 2011 UT App 198, ¶ 15, 258 P.3d 619, 624  (2011) ("A party may seek judicial

review [of a final agency action] only after exhausting all administrative remedies available . . .

.") (citing Utah Code Ann. § 63G-4-401(2)).  Quite simply, allowing Plaintiffs RCRA claims

here to move forward would upset the Utah groundwater discharge permitting program by

allowing both an improper collateral attack and by excusing Plaintiffs' failure to exhaust their

state administrative remedies.  Allowing such claims to proceed would be particularly egregious

here because there is a current permit renewal process underway in which Plaintiffs may now

participate.  Abstention is clearly proper under these circumstances.

---

[12] The exhaustion of administrative remedies and abstention arguments could apply to Count 1 of
Plaintiffs Complaint also.  For example, the Groundwater Discharge Permit (at Appx. A, p. 24-
25) authorizes "collection systems" which includes the leachate collection system that is at issue
within Count 1 of the Complaint.  To this extent, the allegations in Count 1 should be dismissed
accordingly.

## **Conclusion**

For the reasons stated above, PacifiCorp respectfully requests that the Court dismiss Counts 2 and 3 of the Complaint and for such further relief as the Court deems just and appropriate.

DATED this 20th day of May, 2016.

RAY QUINNEY & NEBEKER P.C.


/s/ E. Blaine Rawson
E. Blaine Rawson
Calvin R. Winder

*Attorneys for Defendant PacifiCorp*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of May, 2016, I electronically filed the foregoing

**DEFENDANT PACIFICORP'S MOTION TO DISMISS COUNTS 2 AND 3 OF**

**PLAINTIFFS' FIRST AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF

system which sent notification of such filing to the following:

Rob Dubuc
Western Resource Advocates
150 South 600 East, Suite 2A
Salt Lake City, Utah  84102
Rob.dubuc@westernresources.org

Richard Webster
Public Justice
1825 K Street, NW Suite 200
Washington, DC
rwebster@publicjustice.net

John Barth
P.O. Box 409
Hygiene, CO  80533
barthlawoffice@gmail.com

/s/  Marci Meyers

1374165

28