UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| HEAL UTAH and SIERRA CLUB,<br><br>Plaintiffs,<br><br>v.<br><br>PACIFICORP,<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:16-cv-00120<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiffs HEAL Utah and Sierra Club (collectively, the Groups) brought this citizen suit under the Clean Water Act, claiming Defendant PacifiCorp violated the CWA by discharging dredged or fill material into waters of the United States at its Huntington Power Plant in Utah. The Groups and PacifiCorp filed cross-motions for summary judgment on the Groups' CWA claim.[1] PacifiCorp also moved to dismiss the claim for lack of standing.[2] PacifiCorp additionally filed a Motion to Exclude the testimony of the Groups' expert, Bruce A. Anderson.[3]

The court heard oral argument on the motions on January 8, 2019. After carefully considering the parties' briefing and oral argument, as well as the relevant legal authorities, the court GRANTS PacifiCorp's Motion for Summary Judgment. The remaining motions are DENIED as MOOT.

---

[1] Dkt. 53 (Plaintiffs' Motion for Summary Judgment); Dkt. 57 (Defendant's Motion for Summary Judgment).

[2] Dkt. 56.

[3] Dkt. 54.

# BACKGROUND[4]

HEAL Utah and Sierra Club are environmental organizations whose respective objectives include "protect[ing] public health and the environment in Utah"[5] and "educating and enlisting people to protect and restore the quality of the natural and human environment."[6] PacifiCorp, an Oregon corporation, owns and operates a power plant in Huntington, Utah (the Plant).[7]

The Plant consists of a coal-fired power plant, a "Research Farm," and two landfills, the "Old Landfill" and the "New Landfill."[8] The Plant lies on the south and west side of Huntington Creek.[9] There are a number of drainage basins across the site, including two at issue in this case, Basins 8 and 9.[10] To the extent Basins 8 and 9 produce measurable water flow, it moves through West End and Landfill Canyons, respectively.[11]

In 1979, PacifiCorp built a surge pond to collect storm and spring water at the lower part of Basin 9 and named it "the Duck Pond." At the same time, PacifiCorp dug a ditch connecting the Duck Pond to Huntington Creek.[12] Once the Duck Pond and connecting ditch were built, water from Basins 8 and 9 flowed through West End and Landfill Canyons, collected in the

---

[4] The facts described below are taken primarily from the Groups' Motion for Summary Judgment. Disputes about the facts relevant to this ruling are noted.

[5] Dkt. 53 ¶ 29.

[6] Dkt. 53 ¶ 30.

[7] Dkt. 47 ¶¶ 1, 27.

[8] Dkt. 53 ¶ 2.

[9] *See* Fig. 1. The jurisdictional status of Huntington Creek is not disputed by the parties.

[10] Dkt. 53 ¶¶ 3, 4, 8.

[11] Dkt. 53 ¶¶ 4, 6.

[12] Dkt. 53 ¶ 5.

Duck Pond, and then discharged into Huntington Creek through a metal culvert known as Outfall 001.[13]  The Groups generally refer to the Basin 9 area as the "Duck Pond drainage."[14]

In 2006, the Utah Department of Environmental Quality (DEQ) issued a permit to PacifiCorp for the discharge of certain pollutants (primarily total dissolved solids, or TDS) into Huntington Creek from Outfall 001.[15]  PacifiCorp rescinded this permit in 2014 because it no longer discharged pollutants through Outfall 001, as described in the next section.[16]  Separately, PacifiCorp operates the Plant under a Ground Water Discharge Permit issued by the State of Utah Division of Water Quality (DWQ).[17]

---

[13] Dkt. 53 ¶¶ 4–6.

[14] *See* Dkt. 53 ¶ 4.

[15] Dkt. 53 ¶¶ 12–13.

[16] Dkt. 53 ¶ 21.

[17] Dkt. 57 ¶¶ 8–11; Dkt. 57, Ex. 10.



Figure 1, available at Dkt. 53-1 at 22.

**Section 404 of the Clean Water Act**

The CWA prohibits the discharge of pollutants, including dredged or fill material, into

waters of the United States unless authorized by another provision of the Act.[18]  Section 404 of

the CWA authorizes the issuance of permits for the discharge of dredged or fill material.[19]  To

establish a "dredge and fill" violation under the CWA, a plaintiff must show: (1) the defendant is

a "person" (2) who discharged dredged or fill material (3) into jurisdictional waters of the United

---

[18] 33 U.S.C. § 1311(a) ("[T]he [unpermitted] discharge of any pollutant by any person shall be
unlawful."); 33 U.S.C. § 1362 ("The term 'navigable waters' means the waters of the United States,
including the territorial seas.").

[19] 33 U.S.C. § 1344.

States (4) from a point source (5) without a permit.[20]  The first and fifth elements are not at issue in this case: "persons" subject to the CWA include corporations like PacifiCorp,[21] and PacifiCorp does not dispute that it did not obtain a § 404 permit for any of the conduct the Groups challenge in this lawsuit.

### The Alleged 2007–2008 Violation

Between November 2007 and January 2008, PacifiCorp installed a "collection system" in the Duck Pond drainage, designed to intercept surface water and landfill leachate and pipe it to a pump house near Huntington Creek and then to the Plant.[22]  The intercepted water is primarily used at the Plant, but is sometimes pumped to an evaporation pond east of Huntington Creek.[23] Water from the evaporation pond (including any water originating from the collection system) is "land applied" on PacifiCorp's Research Farm.[24]  The land application of wastewater at Research Farm is governed by PacifiCorp's Ground Water Discharge Permit.[25]

The Groups claim PacifiCorp violated the CWA when it installed the collection system without a § 404 permit.  The Groups point to several elements of the installation they contend violated the CWA.  PacifiCorp "used a track hoe to excavate ditches three feet deep in both Landfill and West End Canyon," placed pipes and filter fabric in the ditches, then placed "a

---

[20] *U.S. v. Hubenka*, 438 F.3d 1026, 1035 (10th Cir. 2006).

[21] 33 U.S.C. § 1362(5).

[22] Dkt. 53 ¶ 18.

[23] Dkt. 53 ¶ 18.

[24] Dkt. 53 ¶ 18.  PacifiCorp maintains water from the collection system makes its way to Research Farm on only "very rare occasion[s] when Unit 2 is inoperable and there is no additional room in the Unit 2 scrubber mist eliminator wash tank."  Dkt. 59 ¶ 18.

[25] Dkt. 57, Ex. 10 at 2.

variety of fill materials over the pipe, including medium gravel, rip-rap and soil."[26]  To connect

the pipes with the pump house, PacifiCorp buried pipes beneath the connecting ditch between the

Duck Pond and Huntington Creek.[27]  Finally, the Groups claim PacifiCorp "placed fill material

in the [connecting ditch]," essentially creating a dam so water would no longer flow to

Huntington Creek.[28]  PacifiCorp does not dispute these assertions other than to challenge the

Groups' use of the term "fill material."[29]

### The Alleged 2008 and 2016 Violations

In 2008, PacifiCorp removed sediment from the Duck Pond, moving some of it up-

canyon from the Duck Pond where it remains in piles.[30]  According to the Groups, "brief heavy

storms" periodically erode the sediment piles and wash material from them downstream back

into the Duck Pond.[31]  They claim such a storm event occurred in 2016 and that the resulting

erosion constituted a § 404 violation.  PacifiCorp disputes both the factual assertion that material

washes back downstream into the Duck Pond and the conclusion that such an event would

constitute a separate § 404 violation.

During a storm in 2016, a large rock fell on part of the collection system, damaging a

pipe.[32]  PacifiCorp employees repaired the pipe, using a shovel to excavate and cut out the

---

[26] Dkt. 53 ¶ 19.

[27] Dkt. 53 ¶ 19.

[28] Dkt. 53 ¶ 20.

[29] Dkt. 59 ¶¶ 19–20.

[30] Dkt. 53 ¶ 25.  PacifiCorp disputes the Groups' assertion that it "dredged" the Duck Pond.  Dkt. 59 ¶ 25.

[31] Dkt. 53 ¶ 26.

[32] Dkt. 53 ¶ 27.

damaged section.[33]  The Groups claim this constituted a § 404 violation because PacifiCorp "excavated and deposited additional fill material" when it repaired and reburied the broken pipe.[34]

### The Groups File Suit

On October 15, 2015, the Groups notified PacifiCorp of their intent to bring a citizen suit under the CWA.[35]  Their notice letter describes various alleged violations of the CWA and the Resource Conservation and Recovery Act, including the Groups' claim that PacifiCorp "filled tributaries of Huntington Creek without a permit."[36]

The Groups filed their original Complaint on February 12, 2016, asserting five claims under the RCRA and CWA.[37]  On October 13, 2017, they filed an Amended Complaint eliminating all but one remaining count, for the unlawful discharge of dredged or fill material into waters of the United States under the CWA.[38]

---

[33] Dkt. 53 ¶ 27.

[34] Dkt. 62 at 17.

[35] Dkt. 2, Ex. 1.  The Groups allege in their original and amended Complaints that they also served the letter on the EPA and Utah DEQ as required under 33 U.S.C. § 1365(b)(1)(A).  *See* Dkt. 47 ¶ 4. PacifiCorp does not dispute the notice letter was served on the proper government agencies.

[36] Dkt. 2, Ex. 1 at 5.

[37] Dkt. 2.

[38] Dkt. 47.

**ANALYSIS**

I.      **SUBJECT MATTER JURISDICTION**

The threshold issue in this case concerns the court's subject-matter jurisdiction. The parties dispute (A) whether the Groups' pre-suit notice satisfies 33 U.S.C. § 1365; and (B) whether the Groups have constitutional standing to pursue the § 404 CWA claim.

The Groups' § 404 CWA claim is primarily centered on the installation of the collection system in 2007–2008. However, in response to PacifiCorp's statute of limitations argument, the Groups argue they have a separate claim relating to the repair of a pipe in the collection system that took place in fall of 2016.[39] Given this position, notice and standing are analyzed separately for the 2007–2008 installation and 2016 repair claim.[40]

A.  **Notice Requirement**

A plaintiff must satisfy three statutory requirements to bring a citizen suit under the CWA. First, the plaintiff must give notice of its intent to sue at least sixty days before filing a private enforcement suit.[41] Second, there must be no ongoing civil or administrative proceeding for the same alleged violations by the State or the EPA.[42] Third, a citizen suit must allege a "continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will

---

[39] At oral argument, both sides agreed the 2016 event is best characterized as a separate and discrete violation rather than a continuing violation of the 2007–2008 conduct.

[40] *See Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 527, 551 (10th Cir. 2016) ("[S]tanding is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he [or she] seeks to press.") (quotation and citations omitted).

[41] 33 U.S.C. § 1365(b)(1)(A).

[42] 33 U.S.C. § 1365(b)(1)(B).

continue to pollute in the future."[43]  PacifiCorp does not dispute that the latter two requirements

are met, but challenges the adequacy of the Groups' notice letter.[44]

The CWA's notice requirement is a "mandatory precondition that, if not met, requires

dismissal of the action."[45]  A notice letter must provide "sufficient information to permit the

recipient to identify the specific standard, limitation, or order alleged to have been violated, the

activity alleged to constitute a violation, the person or persons responsible for the alleged

violation, the location of the alleged violation, [and] the date or dates of such violation."[46]  The

recipient "must understand from the notice what the citizen *is alleging*—not what the citizen

could allege if the citizen knew more or cared about other possible transgressions."[47]  In

determining the sufficiency of a notice letter, the "guiding principle" is whether it contains

enough information to provide the defendant an opportunity to cure any violations and render the

suit unnecessary.[48]

The Groups sent PacifiCorp notice of their intent to sue on October 15, 2015.[49]  As

explained below, the Groups' notice letter satisfies the notice requirement for the 2007–2008

claim, but not the 2016 claim.

---

[43] *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*, 484 U.S. 49, 57 (1989) (interpreting 33 U.S.C. § 1365(a)(1)).

[44] The issue of whether the Groups claim a "continuous or intermittent violation" under *Gwaltney* arises in the statute of limitations analysis below.

[45] *Stone v. High Mountain Mining Co., LLC*, No. 17-cv-1295, 2018 WL 1175039, at *5 (D. Colo. Mar. 5, 2018) (citing *Hallstrom v. Tillamook Cty.*, 593 U.S. 20, 33 (1989)).

[46] 40 C.F.R. § 135.3(a).

[47] *Karr v. Hefner*, 475 F.3d 1192, 1200 (10th Cir. 2007) (quotations omitted) (emphasis in original).

[48] *Id*.

[49] Dkt. 2, Ex. 1.

First, the notice letter is sufficient for the 2007–2008 claim. While PacifiCorp argues the letter fails to mention the connecting ditch as the site of the unpermitted discharge, the court agrees with the Groups that the connecting ditch can be understood as the "the lower portion of the Duck Pond drainage channel that was described in the notice letter and complaint."[50] The notice letter contains sufficient information to alert PacifiCorp about the nature and location of the Groups' claims, including allegations relating to the connecting ditch between the Duck Pond and Huntington Creek.[51]

But the Groups did not provide notice for their claim related to the 2016 repair. The 2016 repair post-dates the October 2015 notice letter. And the court finds unavailing the Groups' argument that the 2015 letter put PacifiCorp on notice for the 2016 repair because it is closely related to the 2007–2008 violation.

Under a Third Circuit rule, "a notice letter which includes a list of discharge violations, by parameter, provides sufficient information for the recipients of the notice to identify violations of the same type (same parameter, same outfall) occurring during and after the period

---

[50] Dkt. 63 at 21–22.

[51] *See* Notice Letter, Dkt. 2, Ex. 1 at 6 ("[PacifiCorp] intercept[ed] natural surface water flows in Landfill Canyon that used to be tributary to Huntington Creek. For example, an October 2009 inspection report states that the ditch that used to carry water from the Duck Pond to Huntington Creek became dry because PacifiCorp intercepted that flow and directed it to the evaporation pond."); *id.* (identifying "the ditch that drained the Duck Pond to Huntington Creek" as one of sites of installation and claiming "PacifiCorp has been in violation of the CWA by discharging fill to waters of the United States and allowing it to remain there without a permit to do so"); *see also* Amended Complaint, Dkt. 47 at ¶ 8 ("PacifiCorp's illegal discharges of fill material intercepted and blocked a natural stream on the plant site, known as the Duck Pond drainage channel, thereby preventing it from flowing into Huntington Creek.").

covered by the notice letter."[52]  Under that rule, at least, if post-notice violations are sufficiently similar to previously noticed violations, no new notice is required.

But even if that rule applied in the Tenth Circuit, the Groups' letter does not contain sufficient information to satisfy the notice requirement for the 2016 repair.  General similarities between the 2007–2008 and 2016 violations are outweighed by the distinct nature of the two sets of violations.  Although both potentially involve the unpermitted discharge of fill material on PacifiCorp's property, the 2016 violation involves conduct of a different type and scope from that noticed in the letter.  As described in the notice letter, the 2007–2008 violation involved installation of a pump house and four separate collection systems made of "concrete or earthen structures that were placed into the stream beds."[53]  In 2016, on the other hand, employees "dug up, repaired, and reburied" a single damaged pipe within the collection system.

In light of these differences, the claims are not sufficiently similar such that the notice requirement is satisfied for the 2016 repair claim.  That claim is therefore dismissed for failure to provide adequate pre-suit notice.[54]

---

[52] *Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1250 (3d Cir. 1995).  The District of Colorado has applied the *Hercules* standard*, see infra* note 54, and in doing so noted it is the "most lenient" among several standards used in other circuits.  *Sierra Club v. City of Colorado Springs*, No. 05-cv-01994-WDM-BNB, 2009 WL 1193513, at *4 n.8 (D. Colo. Apr. 29, 2009).

[53] Dkt. 2, Ex. 1 at 6.

[54] *See City of Colorado Springs*, 2009 WL 1193513, at *4 (applying the *Hercules* standard and finding "the fact that the [post-notice violations] are similar to previously noticed violations in that they unlawful[ly] discharge[] [] wastewater under the permit into the same waters, does not make the January Additions sufficiently similar to other noticed events such that the notice requirement has been satisfied.") (brackets added).

**B. Article III Standing**

To satisfy Article III of the Constitution, a plaintiff must have standing to bring a claim in federal court.[55] "An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purposes, and [3] neither the claim asserted nor the relief requested required the participation of individual members in the lawsuit."[56] Only the first prong is at issue in this case.[57]

To satisfy the first standing element, the Groups must show (1) at least one of their members has suffered an injury in fact that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to [PacifiCorp's illegal conduct]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[58] The Groups fail to meet this standard.

**1. Injury In Fact**

At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" to meet the plaintiff's burden on injury in fact.[59] But at the summary judgment stage, "the plaintiff can no longer rest on such mere allegations, but must set forth by

---

[55] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000).

[56] *Id.* at 181.

[57] PacifiCorp does not dispute that the interests at stake in this lawsuit are germane to the plaintiff organizations' purposes, or that individual members' participation is not required. The court agrees on both points.

[58] *Laidlaw*, 528 U.S. at 180–81.

[59] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true."[60]  "And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial."[61]

Discerning guiding principles from cases analyzing standing elements—particularly for the injury in fact requirement—can prove challenging.  But controlling authority provides some helpful direction in the context of environmental suits.  "In the environmental context, a plaintiff who has repeatedly visited a particular site, has imminent plans to do so again, and whose interests are harmed by a defendant's conduct has suffered injury in fact."[62]  And "[w]hile generalized harm to . . . the environment will not alone support standing, if that harm in fact affects the recreational or even the mere [a]esthetic interests of the plaintiff, that will suffice."[63]  Furthermore, a person's reasonable concerns about pollution can support injury in fact where those concerns directly affect the person's recreational, aesthetic, or economic interests.[64]

To show injury in fact here, the Groups submit declaration testimony of one of their members, Perrine Anderson.  Anderson is a member of an LLC which owns property on Huntington Creek, immediately downstream of the PacifiCorp power plant.[65]  The property contains Anderson's family's apple orchard and a small pond.  Anderson claims she suffers economic, environmental, and aesthetic injury from a reduction in the amount of water flowing

---

[60] *Id.* (quotations and citations omitted).

[61] *Id.* (quotations omitted).

[62] *The Wilderness Soc'y v. Kane Cty., Utah*, 581 F.3d 1198, 1210 (10th Cir. 2009), *on reh'g en banc sub nom. The Wilderness Soc'y v. Kane Cty., Utah*, 632 F.3d 1162 (10th Cir. 2011).

[63] *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

[64] *Laidlaw*, 528 U.S. at 183–84.

[65] Dkt. 53-1, Ex. 34 (Anderson Decl.) ¶ 4.

in Huntington Creek as a result of PacifiCorp's constructed water collection system, and that she suffers or will suffer environmental injury from application of water diverted from the collection system onto Research Farm. She further claims aesthetic injury from the loss of the ability to view, from Highway 31, flowing water in what was previously the connecting ditch. Finally, the Groups claim Anderson suffers procedural injury from the deprivation of the opportunity to participate in a § 404 permit process when PacifiCorp elected to construct the collection system without first seeking a permit. The court addresses the sufficiency of each claimed injury in turn.

### a. Economic, Environmental, and Aesthetic Injury from Reduced Water Flow on Property

The Groups claim Anderson suffers injury from the reduced quantity of water flowing in Huntington Creek on her property. They provide evidence that PacifiCorp's collection system caused the flow of water from the Duck Pond drainage to Huntington Creek to decrease or stop altogether.[66] And because Anderson's property is immediately downstream from PacifiCorp's plant, it is plausible that PacifiCorp's conduct decreased the amount of water flowing into Huntington Creek on Anderson's property. But the proper question for injury is not to what degree the water flow on Anderson's property is reduced, but whether she suffers concrete harm by any reduction in flow.[67]

---

[66] Dkt. 53 at 13–17.

[67] *Laidlaw*, 528 U.S. at 181 ("The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff.").

The court finds insufficient Anderson's claimed economic injury.[68]  The Groups argue

Anderson suffers economic harm because "Huntington Creek flows through [her] property and

contributes water to the pond on her property that can be used to irrigate the family orchard,

which can provide her with economic benefits."[69]  This description of the economic impact of

any reduction in water is speculative.  Anderson avers the "dam which allowed the water to flow

[from the pond] into the property" for irrigation has been in disrepair since 1999.[70]  She has not

repaired the dam because she "[has] not yet decided whether to continue operating the

orchard."[71]  This testimony reveals Anderson has suffered no actual economic harm from

reduced water flow—only the possibility that harm may arise *if* she decides at some unspecified

time in the future to rebuild the dam and begin operating the orchard.[72]  The economic injury is

therefore too speculative to support standing.

The Groups also fail to show Anderson suffers an environmental or aesthetic injury from

reduced water flow.  There are three theories under which a plaintiff can demonstrate injury in

fact based on environmental or aesthetic harm.  First, a plaintiff can show injury based on actual

harm to the environment if the environmental harm "in fact affects [his or her] recreational or . . .

---

[68] PacifiCorp argues Anderson lacks standing to assert an injury related to the property because she does not own it outright.  Under the prudential "shareholder standing rule," a corporate owner is barred from asserting claims belonging to the corporation.  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1156 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 275 (2014).  The rule does not bar suits by plaintiffs who have "a direct, personal interest in a cause of action . . . even if the corporation's rights are also implicated."  *Id.* (quotation omitted).  Because the court finds insufficient showing of injury under constitutional standing rules, it need not reach this prudential standing issue.

[69] Dkt. 53 at 25-26.

[70] Dkt. 53-1, Ex. 34 (Anderson Decl.) ¶ 11.

[71] *Id.*

[72] *See also* Dkt. 53-1, Ex. 35 (Anderson Depo.) at 89:1–9 ("If the water were higher, we could probably use that [dam] again, but it would have to be rebuilt.").

[a]esthetic interests."[73]  Similarly, a plaintiff who has "reasonable concerns" about environmental harm can demonstrate injury where the concerns "directly affect [his or her] recreational, aesthetic, [or] economic interests."[74]  For example, plaintiffs can supply evidence they cease or limit their use and enjoyment of the impacted area because of their reasonable concerns.[75]  Finally, threatened harm to the environment can amount to injury if the threat is imminent (not merely hypothetical) and affects the plaintiff "in a 'personal and individual way.'"[76]  A common thread tying these theories together is that the harm to the environment, whether actual or threatened, must directly and concretely affect the plaintiff's recreational or aesthetic interests.[77]  The Groups have not established this kind of harm here.

In her declaration, Anderson expresses her concern about the "unnatural change in the upstream quantity or quality" of Huntington Creek.[78]  She is concerned PacifiCorp's diversion "could have reduced the amount of water in the pond,"[79] and "could affect water quality in the pond and [her] ability to grow plants on the property."[80]  This is insufficient to fall within any of the three available theories outlined above.

---

[73] *Summers*, 555 U.S. at 494.

[74] *Laidlaw*, 528 U.S. at 181–84.

[75] *Id.*

[76] *Sierra Club v. Franklin Cty. Power of Illinois, LLC*, 546 F.3d 918, 926 (7th Cir. 2008) (citing *Lujan*, 540 U.S. at 560 n.1).

[77] This requirement hearkens back to the broadest standard for injury in fact, that it be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Laidlaw*, 528 U.S. at 180–81.

[78] *E.g.* Dkt. 53-1, Ex. 34 (Anderson Decl.) ¶¶ 14, 15, 17.

[79] Dkt. 53-1, Ex. 34 (Anderson Decl.) ¶ 15.

[80] Dkt. 53-1, Ex. 34 (Anderson Decl.) ¶ 22.

Neither Anderson nor the Groups demonstrate actual change to the quantity or quality of Huntington Creek water on the property. Anderson does not state how her concerns, however reasonable, directly and concretely affect her recreational, aesthetic, or economic interests. She does not say, for example, that she limits her recreational use of the pond or property due to her concerns, or that she has experienced any aesthetic change such as lower water level in the pond. Essentially, what Anderson expresses is a concern that she *might* have suffered an injury.[81] Though she may be concerned about her ability to grow plants on the property, this concern is also too speculative to constitute an economic injury for the reasons previously explained. Finally, to the extent the Groups claim Anderson suffers from a threat of environmental harm due to reduced water flow on the property, they have not demonstrated its imminence, especially considering the diversion has existed since at least 2008.

### b. Environmental Injury from Land Application of Diverted Water on Research Farm

The Groups next claim Anderson suffers environmental injury from the risk of runoff or groundwater contamination from PacifiCorp's Research Farm. Some of the water diverted from the collection system is pumped to an irrigation pond, and water from the irrigation pond is land-applied on Research Farm.[82] As evidence of threatened environmental harm, the Groups cite a report by the Utah Department of Water Quality (DWQ) prepared in 2017. The report finds

---

[81] *See, e.g.* Dkt. 53-1, Ex. 34 (Anderson Decl.) ¶ 14 ("I am concerned about any unnatural change in the upstream quantity or quality of that creek water. I enjoy viewing and contemplating the creek in its natural condition. I enjoy seeing water flowing into the creek and through the property. My enjoyment of the property is reduced by knowledge that there have been unnatural changes in the upstream quantity or quality of that creek water.").

[82] Dkt. 53-1, Ex. 24 at p. 580 ("[T]he discharge from the Duck Pond is piped to the same pump station where the field drain water collects and is also pumped to the 'irrigation pond' . . . until it is land applied in one of the aforementioned farm areas.").

water applied at Research Farm "contains elevated and variable levels of total dissolved solids (TDS), nitrate, and boron."[83]  The Groups highlight the DWQ report's conclusion that "[t]he main potential threat that this site poses to beneficial uses of water is discharge of contaminants into Huntington Creek."[84]

Although it poses a close call, this showing fails to demonstrate injury for two reasons. First, the threat of environmental harm is not sufficiently imminent.  Read in context, the DWQ report makes clear no actual environmental harm has occurred.[85]  The report indicates there is a "potential" threat of future contamination, but it does so in terms that mirror the "some day" language[86] the Supreme Court rejected in *Lujan*.[87]  Put differently, the DWQ supports the hypothetical possibility that a threat of environmental harm could develop, but not the existence of a present threat sufficient to support standing.[88]

Second, the Groups fail to show Anderson is personally affected by the risk of environmental harm.  Anderson states the increased risk of contamination from Research Farm

---

[83] Dkt. 53-1, Ex. 31 at p. 660.

[84] Dkt. 53-1, Ex. 31 at p. 663.

[85] Dkt. 53-1, Ex. 31 at p. 663 ("Nevertheless, beneficial uses of ground water have not been affected, and human health and the environment have not been endangered by land application of wastewater at the Huntington Power Plant site.").

[86] Dkt. 53-1, Ex. 31 at p. 660 ("With continued application of wastewater on the Research Farm site, at some point in the future, salt accumulation will inhibit crop growth and another means of wastewater disposal will need to be implemented.").

[87] *Lujan*, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.") (emphasis in original).

[88] *See Franklin Cty. Power of Illinois, LLC*, 546 F.3d at 926 (finding an imminent threat where during the course of litigation, the defendant company publicly announced its commitment to build the power plant at issue in the case, thereby introducing a "fresh threat" of pollution-based injury).

has "reduced [her] enjoyment of the creek and the property."[89]  This is due to her concerns the

land-application on Research Farm "could affect water quality in the pond and [her] ability to

grow plants on the property" and "could add salt to the Creek [which] will contribute to levels of

salt in the soil on the property that will inhibit plant growth there."[90]  But considering

Anderson's representation that she "[has] not yet decided whether to continue operating the

orchard,"[91] any decreased ability to grow plants is too speculative to support standing.  And she

does not otherwise aver that her recreational or aesthetic interests are concretely affected by the

"potential" threat of increased risk.[92]  Once again, Anderson's statements are best characterized

as concerns that she *might* someday be injured.  These are insufficient to establish injury in fact.

### c.  Aesthetic Injury from Loss of Ability to View Water from Highway 31

The Groups claim Anderson suffers an aesthetic injury from her inability to "view and

enjoy natural streams flowing into Huntington Creek when she drives on the highway that runs

by the Plant."[93]  They cite testimony that Anderson "like[s] to look for birds and wildlife in areas

with streams and vegetation."[94]  As she explains, "PacifiCorp's conversion of the area from a

natural stream to an unnatural piping system with no visible stream harms my aesthetic and

---

[89] Dkt. 53-1, Ex. 34 (Anderson Decl.) ¶ 21.

[90] *Id.* ¶ 22.

[91] *Id.* ¶ 11.

[92] *See Franklin Cty. Power of Illinois*, 546 F.3d at 925–26 (finding concrete and particularized injury where the threat of exposure to pollutants would cause plaintiff to "forego[] her regular visits to the lake").

[93] Dkt. 53 at 26.

[94] Dkt. 53-1, Ex. 34 (Anderson Decl.) ¶ 24.

environmental interests of enjoying and viewing the wild and natural characteristics of flowing streams along Highway 31."[95]

Although there are legal[96] and factual[97] issues with Anderson's testimony, it ultimately fails to support standing because it does not show a concrete or particularized injury. Anderson says PacifiCorp's activities "reduced [her] aesthetic enjoyment of the area," but does not say she personally experienced any aesthetic change from Highway 31. For example, she does not claim to have ever seen "flowing water, related vegetation, or stream channel[s]" prior to implementation of the collection system—only that a tributary "would have been easily visible" before its installation.[98] She "like[s] to look for birds and wildlife in areas with streams and vegetation," but does not claim she ever looked for or viewed those things from Highway 31, before or after the collection system was installed.[99] Critically, she offers no statement describing whether or how the aesthetic view changed as a result of the installation of the collection system. At bottom, her testimony merely describes things she enjoys viewing, and

---

[95] *Id.* ¶ 25.

[96] It is unsettled in this circuit whether a party can claim aesthetic injury based on an aesthetic change to another's private property. The issue is whether such an injury may constitute an injury to a "legally protected interest." *Compare The Wilderness Soc'y*, 581 F.3d at 1212 ("[T]o allege a legally protected, concrete aesthetic interest, a plaintiff must show merely that the challenged action affects his aesthetic or ecological surroundings.") *with Utah v. Norton*, No. 2:96-CV-0870, 2006 WL 2711798, at *12 (D. Utah Sept. 20, 2006), *aff'd sub nom. Utah v. U.S. Dep't of Interior*, 535 F.3d 1184 (10th Cir. 2008) ("It is not enough that the environment is being damaged if a plaintiff can point to no legally protected interest in keeping a particular piece of land in its pristine state. SUWA's interpretation would convert the recognition that environmental injuries count for purposes of standing analysis into a license to complain in court of any land-use decision with which any person disagrees.").

[97] PacifiCorp argues strenuously that Anderson could not have suffered an injury because "it is impossible to see the bottom of the ditch where the water would flow . . . from Highway 31." Dkt. 64 at 13.

[98] *See* Dkt. 53-1, Ex. 34 (Anderson Decl.) ¶ 24.

[99] *See* Dkt. 53-1, Ex. 34 (Anderson Decl.) ¶ 25.

sates that she does not see those things from Highway 31. Her conclusory statement that PacifiCorp's conduct reduced her enjoyment of the area, without testimony demonstrating she personally experienced any aesthetic change from Highway 31, cannot establish a concrete injury in fact.[100]

### d. Procedural Injury from Loss of Opportunity to Participate in § 404 Permit Process

Finally, the Groups claim Anderson suffered a procedural injury due to her inability to participate in a § 404 permit process prior to the installation of the collection system. PacifiCorp responds that the Groups cannot assert a procedural injury in a suit against a non-governmental party. As discussed below, the court declines to expand procedural injury jurisprudence as the Groups request.

Neither side cites controlling authority directly addressing this issue. PacifiCorp cites various procedural injury cases, arguing the common posture in those cases—i.e. suits against the government agencies—forecloses the availability of a procedural injury in a suit against a private party.[101] The Groups disagree with the conclusion PacifiCorp draws from those cases, maintaining the deprivation of procedural opportunities constitutes cognizable injury in fact regardless of the defendant's identity. But the Groups cite only one case in support of their

---

[100] *See Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process. But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured."); *Southern Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1155 (10th Cir. 2013) ("As a general rule . . . 'environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'") (quoting *Laidlaw*, 528 U.S. at 182)).

[101] Dkt. 56 at 14–15.

position.  In that case, a district court found procedural standing in a case against a private

company defendant who "evaded" Clean Air Act requirements by failing to apply for a

preconstruction permit.[102]  Beyond the fact that the case is not controlling, it provides little

persuasive value due to the lack of analysis on this point; the court did not justify its unusual

application of the procedural injury doctrine, citing only to procedural standing cases asserted

against government agencies.[103]

Upon review of these cases, and absent controlling authority on this point, the court

declines to recognize procedural injury as a basis for standing in a suit against a non-

governmental party.  With the sole exception noted above, every procedural standing case cited

by the parties names the government party responsible to provide the procedure in question.[104]

The Groups cannot therefore rely on procedural injury to establish standing.

### 2.  Injury In Fact for the 2016 Violation

Although it is dismissed as explained above for inadequate notice, the Groups also fail to

show standing to assert the 2016 repair claim.  In their briefing, the Groups do not tie any of

Anderson's purported injuries to the 2016 claim.  At oral argument the Groups put forth

procedural injury as their basis for standing to assert this claim, but as just explained, the court

---

[102] *Assoc. of Irritated Residents v. C & R Vanderham Dairy*, 2007 WL 2815038, at *15 (E.D. Cal. Sept. 25, 2007).

[103] *Id.*

[104] *See, e.g.*, *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1215 (10th Cir. 2017) ("We have frequently found standing based on a procedural injury in cases in which environmental groups have alleged that an agency failed to follow the required procedures in taking an action that negatively impacted members' concrete interest in protecting and enjoying the affected land"); *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.").

declines to recognize procedural standing in a suit against a private party. Thus, the Groups fail to demonstrate standing for the 2016 repair claim.

## II.     THE GROUPS' 2008 CLAIM IS TIME-BARRED[105]

Even if the Groups had demonstrated standing for their claim related to the 2007–2008 collection system installation, that claim is time-barred under the five-year statute of limitations found in 28 U.S.C. § 2462, which both sides agree applies to the Groups' claim for civil penalties. Under § 2462, a suit must be commenced "within five years from the date when the claim first accrued,"[106] plus sixty days to account for the notice requirement.[107] The Groups filed their original Complaint on February 12, 2016.[108] Thus, they are barred from asserting any claims for violations which first accrued on or before December 14, 2010.

The Groups do not dispute the collection system was installed in 2007–2008, outside the statute of limitations period.[109] They nevertheless argue the claim is not time-barred for two reasons: (1) PacifiCorp is in "continuing violation" of the CWA each day the fill material remains in place, and (2) PacifiCorp discharged additional fill materials in two discrete violations after 2008. The court addresses both arguments in turn.

---

[105] The court cannot bypass standing and proceed directly to a merits question, even where "the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93 (1998). But having conducted a standing analysis, the court provides its statute of limitations analysis as an alternate basis for dismissal of the Groups' claim. *See Doyle v. Oklahoma Bar Ass'n*, 998 F.2d 1559, 1567 (10th Cir. 1992).

[106] 28 U.S.C. § 2462.

[107] *See Sierra Club v. El Paso Gold Mines, Inc.*, 2003 WL 2565872, at *6 (D. Colo. Feb. 10, 2003) ("I may assess civil penalties for a period of five years plus sixty days before the action was commenced until the trial date.").

[108] Dkt. 2.

[109] *See* Dkt. 62 at 17.

### A. Continuing Violation

The Groups argue the dredge and fill violation that occurred during the 2007–2008 installation is not time-barred under § 2462 because that violation continues each day the fill material remains in place. The court disagrees. Although the violation is "continuing" in one sense, it is nevertheless time-barred.

The Tenth Circuit has interpreted § 2462 to bar continuing violations first accruing outside the limitations period. In *Sierra Club v. Oklahoma Gas & Electric Company*,[110] the Sierra Club brought a citizen suit under the Clean Air Act. The Sierra Club sought civil penalties for the unpermitted construction or modification of a boiler. Construction began more than five years before the suit was filed—i.e. outside the five-year statute of limitations period—but continued into the limitations period. The Tenth Circuit first characterized the ongoing construction as a "continuing violation," meaning conduct that, "as a whole can be considered as a single course of conduct" rather than "repeated, discrete violations."[111] The defendants in *Oklahoma Gas* engaged in a single act of "constructing" the boiler, not a "disjointed series of discrete acts of construction."[112]

The court then held that under § 2462, "a continuing violation is actionable even before the last act of the violation where the conduct that has already occurred is sufficient to support a claim."[113] Put differently, "a claim accrues as soon as the plaintiff can file suit and obtain

---

[110] 816 F.3d 666 (10th Cir. 2016).

[111] *Id.* at 672 and n.5.

[112] *Id.* at 672.

[113] *Id.* at 673.

relief."[114]  Under § 2462, the limitations period begins to run when a claim "*first* accrues,"

regardless of whether it continues to "reaccrue."[115]  Sierra Club's claim was found to be time-

barred in *Oklahoma Gas* because the claim could have been asserted on the first day of

unpermitted construction.[116]

The facts here compel the same result.  PacifiCorp installed the collection system in

2007–2008, activity the Groups maintain constituted a § 404 violation.  As in *Oklahoma Gas*,

PacifiCorp's addition of fill materials to jurisdictional waters during the installation of the

collection system gave rise to a claim that first accrued outside the statutory period, even if its

effects continued.  The Groups could have filed suit and obtained relief beginning in 2007 or

2008 at the latest, meaning the statute of limitations was exhausted no later than sometime in

2013—several years before the 2016 filing of this lawsuit.  The enduring presence of the fill

material is at best a "continuing violation" which, under *Oklahoma Gas*, does not reset § 2462's

statutory clock.[117]

This application achieves the most sensible result.  As one court pointed out, "if the

statute of limitations were to begin to run only when the defendant has removed fill and restored

---

[114] *Id*. (quotation omitted).  *See also Gabelli v. SEC*, 568 U.S. 442, 448 (2013) ("[A] claim accrues when the plaintiff has a complete and present cause of action.") (quotation omitted).

[115] *Oklahoma Gas*, 816 F.3d at 671.

[116] *Id.* at 671–72.

[117] For a continuing violation to exist, there must be "some affirmative conduct within the limitations period and not merely the abatable but unabated inertial consequences of some pre-limitations action." *Oklahoma Gas*, 816 F.3d at 672.  PacifiCorp's failure to remove the fill material might be better characterized as an "inertial consequence" of the 2007–2008 installation, rather than as affirmative conduct, and thus not a continuing violation (or any violation) at all.  But granting the Groups the benefit of the doubt and assuming the existence of a continuing violation under *Oklahoma Gas*, the claim is still time-barred for the reasons discussed.

the [waters,] it might never begin to run at all."[118]  If the Groups' statutory clock "reset" each day the fill remained in place, the statute of limitations would provide no limit at all.[119]

The Groups seek to avoid *Oklahoma Gas*' holding, relying on a more recent Tenth Circuit case, *Benham v. Ozark Materials River Rock, LLC*.[120]  In *Benham*, a citizen suit under the CWA, the Tenth Circuit quoted the lower court with apparent approval for the proposition that "[u]ntil a pollutant, such as fill material, that has been placed in a wetland is removed, its presence constitutes a continuing violation."[121]  But *Benham* does not address "continuing violations" in the § 2462 context.  Rather, it addresses the separate jurisdictional requirement prescribed in *Gwaltney*.  Under *Gwaltney*, a court lacks subject matter jurisdiction in a citizen suit unless the plaintiff demonstrates a "continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future."[122]  The Tenth Circuit in *Benham* agreed that *Gwaltney*'s jurisdictional requirement was met by the continuing presence of fill material.[123]  *Benham* expresses no direct or implicit opinion about whether the fill material constituted a continuing violation for purposes of § 2462.

---

[118] *U.S. v. Telluride Co*, 884 F. Supp. 404, 408 (D. Colo. 1995), *rev'd on other grounds*, 146 F.3d 1241 (10th Cir. 1998).

[119] *Cf. SEC v. Kokesh*, 884 F.3d 979, 981 (10th Cir. 2018) (discussing the practical concerns behind the statute of limitations issue in *Oklahoma Gas* and other cases with continuing violations).

[120] 885 F.3d 1267 (10th Cir. 2018).

[121] *Id.* at 1275 (quoting the court below).

[122] *Gwaltney*, 484 U.S. at 57 (interpreting 33 U.S.C. § 1365(a)).  The parties do not dispute that the Groups' claim for the 2007–2008 conduct constitutes a continuing violation under *Gwaltney*.

[123] 885 F.3d at 1277–78 ("[E]ven assuming that Mr. Benham's suit overlaps with the 2005 violation . . . this is not an action for a 'wholly past' violation.  Rather the district court found that Ozark's deposits of dredge and fill material constitute a 'continuing' violation of the CWA . . . over which the court has subject matter jurisdiction, *see Gwaltney*, 484 U.S. at 59.") (citation to *Gwaltney* in original) (other citation omitted).

The Groups nevertheless argue *Benham*'s "continuing violation" language should apply with equal force to the § 2462 analysis, citing two district court cases which "used the continuing-violation doctrine in both contexts."[124] The court declines to rely on those two non-controlling cases, particularly in view of clear language from the Tenth Circuit in *Oklahoma Gas*. And there is good reason to view the *Gwaltney* jurisdictional requirement and § 2462 differently. Although both standards deal with a similar issue—the import of a violation's ongoing effects—they serve distinct purposes.[125]

Here, the continuing of presence fill material from PacifiCorp's 2007–2008 installation satisfies *Gwaltney*'s "continuous violation" requirement, but it does not "reset" § 2462's statutory clock. The Groups' claim for the 2007–2008 conduct is therefore time-barred.[126]

### B. Post-2008 Discharges

The Groups claim PacifiCorp engaged in two unpermitted discharges of fill material within the five-year limitations period, separate from the 2007–2008 collection system installation. First, they claim PacifiCorp "dredged the Duck Pond in 2008 . . . and placed the

---

[124] Dkt. 62 at 14 (citing *Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Kovich*, 820 F. Supp. 2d 859, 896 (N.D. Ind. 2011); *United States v. Reaves*, 923 F. Supp. 130, 1534 (M.D. Fla. 1996)).

[125] *See Friends of Warm Springs, Inc. v. McCarthy*, No. 8:13-cv-3236-R-23TGW, 2015 WL 2169241, at *3 n.6 (M.D. Fla. May 8, 2015) ("The parties in this action and the opinions in many other actions conflate the limitation in 28 U.S.C. § 2462 with the jurisdictional requirement in 33 U.S.C. § 1365(a). 28 U.S.C. § 2462 forbids liability under 33 U.S.C. § 1311(a) if more than five years has passed between the accrual of the claim and the filing of the complaint. Separately, 33 U.S.C. § 1365(a) 'require[s for jurisdiction] that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future.'").

[126] The Groups also argue their claim should not be time-barred because the CWA authorizes civil penalties "per day for each violation." Dkt. 62 at 15 (citing 33 U.S.C. § 1319(d)). But *Oklahoma Gas* addresses this argument directly in the context of the Clean Air Act's similar penalty provision. 816 F.3d at 673. The Tenth Circuit concludes "[w]e see a difference between the availability of a statutory penalty and the initial accrual of the violation giving rise to penalties." *Id.*

dredged material up canyon in the Duck Pond drainage channel, where it has been washing back downstream into the Duck Pond during periodic storms since 2008, including a storm in 2016."[127]  The claim for this discharge is time-barred for the same reason as the installation of the collection system: it "first accrued" in 2008 when the dredged material was placed in the drainage channel.  The effects of subsequent storms are not separate violations, but rather the "abatable but unabated inertial consequences of some pre-limitations action" to which the *Oklahoma Gas* court referred.[128]

As previously discussed, the Groups also claim that in 2016, PacifiCorp "excavated and deposited additional fill material in the Duck Pond drainage without a § 404 permit when it dug up, repaired, and reburied a broken pipe in the collection system."[129]  PacifiCorp acknowledges this claim "might avoid the time bar" but argues the Groups have not shown the repair took place in jurisdictional waters.  Assuming the 2016 repair gives rise to a claim arising within the statute of limitations, that claim fails for lack of notice and failure to establish standing—as explained above.

## C.  Equitable Claim

In addition to claims for penalties, the Groups also seek declaratory relief and an injunction requiring PacifiCorp to "remove the illegal fill material and restore the affective tributary" or apply for a § 404 permit.  Because their claims for penalties are time-barred, the

---

[127] Dkt. 62 at 17.

[128] *See Oklahoma Gas*, 816 F.3d at 672.

[129] Dkt. 62 at 17.

Groups' claim for declaratory and injunctive relief is barred under the concurrent remedy doctrine.

"[A]n equitable claim is barred where the only difference between it and a time-barred legal claim is the relief sought."[130] This principle applies with equal force to claims brought by citizens under environmental statutes.[131] The Groups' claim for declaratory and injunctive relief relies on the same facts supporting its claims for penalties, and it is therefore barred under the concurrent remedy doctrine.[132]

## CONCLUSION

Because the Groups have failed to demonstrate the requisite notice to assert their 2016 claim, standing to assert all of their claims, and alternatively because the claims are time-barred, PacifiCorp's Motion for Summary Judgment[133] is GRANTED. Given this ruling, the remaining pending Motions[134] are DENIED as MOOT. The Clerk of Court is directed to close this case.

DATED this 22nd day of March, 2019.

BY THE COURT

_____

ROBERT J. SHELBY
United States Chief District Judge

---

[130] *Oklahoma Gas*, 816 F.3d at 675 (quotation omitted).

[131] *Id.* at 676.

[132] In oral argument, the Groups argued they have a separate claim for declaratory relief based on supplemental facts raised in PacifiCorp's application to the Army Corps. The Groups did not move for such relief in its pleadings or briefs, and it is therefore not fairly before the court.

[133] Dkt. 57.

[134] Dkt. 53; Dkt. 54; Dkt. 56.